# UNITED STATES *v.* WINSTAR CORP. ET AL.

No. 95–865.   Argued April 24, 1996—Decided July 1, 1996

840

842

SOUTER, J., announced the judgment of the Court and delivered an opinion, in which STEVENS and BREYER, JJ., joined, and in which O'CONNOR, J., joined except as to Parts IV–A and IV–B. BREYER, J., filed a concurring opinion, *post*, p. 910. SCALIA, J., filed an opinion concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined, *post*, p. 919. REHNQUIST, C. J., filed a dissenting opinion, in which GINSBURG, J., joined as to Parts I, III, and IV, *post*, p. 924.

*Deputy Solicitor General Bender* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Hunger, James A. Feldman, Douglas Letter,* and *Jacob M. Lewis.*

*Joe G. Hollingsworth* argued the cause for respondent Glendale Federal Bank, FSB. With him on the brief were *Jerry Stouck, Donald W. Fowler, Catherine R. Baumer, Carter G. Phillips, Richard D. Bernstein, Theodore R. Posner,* and *Jesse H. Choper. Charles J. Cooper* argued the cause for respondents Winstar Corp. et al. With him on the brief

were *Michael A. Carvin, Robert J. Cynkar,* and *Vincent J. Colatriano.*\*

JUSTICE SOUTER announced the judgment of the Court and delivered an opinion, in which JUSTICE STEVENS and JUSTICE BREYER join, and in which JUSTICE O'CONNOR joins except as to Parts IV–A and IV–B.

The issue in this case is the enforceability of contracts between the Government and participants in a regulated industry, to accord them particular regulatory treatment in exchange for their assumption of liabilities that threatened to produce claims against the Government as insurer. Although Congress subsequently changed the relevant law, and thereby barred the Government from specifically honoring its agreements, we hold that the terms assigning the risk of regulatory change to the Government are enforceable, and that the Government is therefore liable in damages for breach.

---

*Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *Herbert L. Fenster, Tami Lyn Azorsky,* and *Robin S. Conrad;* for the Aerospace Industries Association of America, Inc., et al. by *Clarence T. Kipps, Jr., Alan I. Horowitz,* and *Mac S. Dunaway;* for AmBase Corp. et al. by *Laurence H. Tribe, Brian Stuart Koukoutchos, Harvey Silverglate,* and *John C. Millian;* for the American Association of State Colleges and Universities et al. by *Joseph N. Onek, Kent R. Morrison, Robert P. Charrow, Sheldon Elliot Steinbach,* and *J. Mark Waxman;* for Coast Federal Bank, FSB, by *Daniel J. Goldberg* and *Matthew G. Ash;* for Dollar Bank, FSB, by *Paul Blankenstein, John K. Bush,* and *Robert T. Messner;* for the Franklin Financial Group, Inc., et al. by *Thomas M. Buchanan, Paul M. Fish, Ronald R. Glancz, John F. Cooney, Don S. Willner,* and *Jerrold J. Ganzfried;* for Keystone Holdings, Inc., et al. by *Melvin C. Garbow* and *Edward H. Sisson;* for Long Island Savings Bank, FSB, by *Russell E. Brooks* and *Fred W. Reinke;* for Trinity Ventures, Ltd., et al. by *John C. Millian, John K. Bush,* and *Wesley G. Howell, Jr.;* for the Watts Health Foundation, Inc., et al. by *Peter J. Gregora* and *Kenneth R. Heitz;* and for the Western Federal Savings and Loan Association et al. by *Dennis A. Winston.*

## I

We said in *Fahey* v. *Mallonee*, 332 U. S. 245, 250 (1947), that "[b]anking is one of the longest regulated and most closely supervised of public callings." That is particularly true of the savings and loan, or "thrift," industry, which has been described as "a federally-conceived and assisted system to provide citizens with affordable housing funds." H. R. Rep. No. 101–54, pt. 1, p. 292 (1989) (House Report). Because the contracts at issue in today's case arise out of the National Government's efforts over the last decade and a half to preserve that system from collapse, we begin with an overview of the history of federal savings and loan regulation.

## A

The modern savings and loan industry traces its origins to the Great Depression, which brought default on 40 percent of the Nation's $20 billion in home mortgages and the failure of some 1,700 of the Nation's approximately 12,000 savings institutions. *Id.*, at 292–293. In the course of the debacle, Congress passed three statutes meant to stabilize the thrift industry. The Federal Home Loan Bank Act created the Federal Home Loan Bank Board (Bank Board), which was authorized to channel funds to thrifts for loans on houses and for preventing foreclosures on them. Ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U. S. C. §§ 1421–1449 (1988 ed.)); see also House Report, at 292. Next, the Home Owners' Loan Act of 1933 authorized the Bank Board to charter and regulate federal savings and loan associations. Ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U. S. C. §§ 1461–1468 (1988 ed.)). Finally, the National Housing Act created the Federal Savings and Loan Insurance Corporation (FSLIC), under the Bank Board's authority, with responsibility to insure thrift deposits and regulate all federally insured thrifts. Ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U. S. C. §§ 1701–1750g (1988 ed.)).

The resulting regulatory regime worked reasonably well until the combination of high interest rates and inflation in the late 1970's and early 1980's brought about a second crisis in the thrift industry. Many thrifts found themselves holding long-term, fixed-rate mortgages created when interest rates were low; when market rates rose, those institutions had to raise the rates they paid to depositors in order to attract funds. See House Report, at 294–295. When the costs of short-term deposits overtook the revenues from long-term mortgages, some 435 thrifts failed between 1981 and 1983. *Id.*, at 296; see also General Accounting Office, Thrift Industry: Forbearance for Troubled Institutions 1982–1986, p. 9 (May 1987) (GAO, Forbearance for Troubled Institutions) (describing the origins of the crisis).

The first federal response to the rising tide of thrift failures was "extensive deregulation," including "a rapid expansion in the scope of permissible thrift investment powers and a similar expansion in a thrift's ability to compete for funds with other financial services providers." House Report, at 291; see also *id.*, at 295–297; Breeden, Thumbs on the Scale: The Role that Accounting Practices Played in the Savings and Loan Crisis, 59 Ford. L. Rev. S71, S72–S74 (1991) (describing legislation permitting nonresidential real estate lending by thrifts and deregulating interest rates paid to thrift depositors).[1] Along with this deregulation came moves to weaken the requirement that thrifts maintain adequate capital reserves as a cushion against losses, see 12 CFR § 563.13 (1981), a requirement that one commentator described as "the most powerful source of discipline for financial institutions." Breeden, *supra*, at S75. The result was a drop in capital reserves required by the Bank Board from five to

---

[1] The easing of federal regulatory requirements was accompanied by similar initiatives on the state level, especially in California, Florida, and Texas. The impact of these changes was substantial, since as of 1980 over 50 percent of federally insured thrifts were chartered by the States. See House Report, at 297.

four percent of assets in November 1980, see 45 Fed. Reg. 76111, and to three percent in January 1982, see 47 Fed. Reg. 3543; at the same time, the Board developed new "regulatory accounting principles" (RAP) that in many instances replaced generally accepted accounting principles (GAAP) for purposes of determining compliance with its capital requirements.[2] According to the House Banking Committee, "[t]he use of various accounting gimmicks and reduced capital standards masked the worsening financial condition of the industry, and the FSLIC, and enabled many weak institutions to continue operating with an increasingly inadequate cushion to absorb future losses." House Report, at 298. The reductions in required capital reserves, moreover, allowed thrifts to grow explosively without increasing their capital base, at the same time deregulation let them expand into new (and often riskier) fields of investment. See Note, Causes of the Savings and Loan Debacle, 59 Ford. L. Rev. S301, S311 (1991); Breeden, *supra*, at S74–S75.

While the regulators tried to mitigate the squeeze on the thrift industry generally through deregulation, the multitude of already-failed savings and loans confronted FSLIC with deposit insurance liabilities that threatened to exhaust its insurance fund. See *Olympic Federal Savings and Loan Assn.* v. *Director, Office of Thrift Supervision,* 732 F. Supp.

---

[2] "Regulatory and statutory accounting gimmicks included permitting thrifts to defer losses from the sale of assets with below market yields; permitting the use of income capital certificates, authorized by Congress, in place of real capital; letting qualifying mutual capital certificates be included as RAP capital; allowing FSLIC members to exclude from liabilities in computing net worth, certain contra-asset accounts, including loans in process, unearned discounts, and deferred fees and credits; and permitting the inclusion of net worth certificates, qualifying subordinated debentures and appraised equity capital as RAP net worth." House Report, at 298. The result of these practices was that "[b]y 1984, the difference between RAP and GAAP net worth at S&L's stood at $9 billion," which meant "that the industry's capital position, or . . . its cushion to absorb losses was overstated by $9 billion." *Ibid.*

1183, 1185 (DC 1990). According to the General Accounting Office, FSLIC's total reserves declined from $6.46 billion in 1980 to $4.55 billion in 1985, GAO, Forbearance for Troubled Institutions 12, when the Bank Board estimated that it would take $15.8 billion to close all institutions deemed insolvent under GAAP. General Accounting Office, Troubled Financial Institutions: Solutions to the Thrift Industry Problem 108 (Feb. 1989) (GAO, Solutions to the Thrift Industry Problem). By 1988, the year of the last transaction involved in this case, FSLIC was itself insolvent by over $50 billion. House Report, at 304. And by early 1989, the GAO estimated that $85 billion would be needed to cover FSLIC's responsibilities and put it back on the road to fiscal health. GAO, Solutions to the Thrift Industry Problem 43. In the end, we now know, the cost was much more even than that. See, e. g., Horowitz, The Continuing Thrift Bailout, Investor's Business Daily, Feb. 1, 1996, p. A1 (reporting an estimated $140 billion total public cost of the savings and loan crisis through 1995).

Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers." See GAO, Solutions to the Thrift Industry Problem 52; L. White, The S&L Debacle: Public Policy Lessons for Bank and Thrift Regulation 157 (1991) (White).[3]

---

[3] See also White 157 (noting that "[t]he FSLIC developed lists of prospective acquirers, made presentations, held seminars, and generally tried to promote the acquisitions of these insolvents"); Grant, The FSLIC: Protection through Professionalism, 14 Federal Home Loan Bank Board Journal 9-10 (Feb. 1981) (describing the pros and cons of various default-prevention techniques from FSLIC's perspective). Over 300 such mergers occurred between 1980 and 1986, as opposed to only 48 liquidations. GAO, Forbearance for Troubled Institutions 13. There is disagreement as to whether the Government actually saved money by pursuing this course rather than simply liquidating the insolvent thrifts. Compare, e. g., Brief for Franklin Financial Group, Inc., et al. as Amici Curiae 7,

Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash contributions from FSLIC were often part of a transaction. See M. Lowy, High Rollers: Inside the Savings and Loan Debacle 37 (1991) (Lowy). Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations. See Investigation of Lincoln Savings & Loan Assn.: Hearing Before the House Committee on Banking, Finance, and Urban Affairs, 101st Cong., 1st Sess., pt. 5, p. 447 (1989) (testimony of M. Danny Wall, Director, Office of Thrift Supervision) (noting that acquirers of failing thrifts were allowed to use certain accounting methods "in lieu of [direct] federal financial assistance").

## B

Under GAAP there are circumstances in which a business combination may be dealt with by the "purchase method" of accounting. See generally R. Kay & D. Searfoss, Handbook of Accounting and Auditing 23–21 to 23–40 (2d ed. 1989) (describing the purchase method); Accounting Principles Board Opinion No. 16 (1970) (establishing rules as to what method must be applied to particular transactions). The critical aspect of that method for our purposes is that it permits the acquiring entity to designate the excess of the purchase price

quoting remarks by H. Brent Beasley, Director of FSLIC, before the California Savings and Loan League Management Conference (Sept. 9, 1982) (concluding that FSLIC-assisted mergers have " '[h]istorically . . . cost about 70% of [the] cost of liquidation' "), with GAO, Solutions to the Thrift Industry Problem 52 ("FSLIC's cost analyses may . . . understat[e] the cost of mergers to the government").

over the fair value of all identifiable assets acquired as an intangible asset called "goodwill." *Id.*, ¶ 11, p. 284; Kay & Searfoss, *supra*, at 23–38.[4] In the ordinary case, the recognition of goodwill as an asset makes sense: a rational purchaser in a free market, after all, would not pay a price for a business in excess of the value of that business's assets unless there actually were some intangible "going concern" value that made up the difference. See Lowy 39.[5] For that reason, the purchase method is frequently used to account for acquisitions, see A. Phillips, J. Butler, G. Thompson, & R. Whitman, Basic Accounting for Lawyers 121 (4th ed. 1988), and GAAP expressly contemplated its application to at least some transactions involving savings and loans. See Financial Accounting Standards Board Interpretation No. 9 (Feb. 1976). Goodwill recognized under the purchase method as the result of an FSLIC-sponsored supervisory merger was generally referred to as "supervisory goodwill."

Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case. Because FSLIC had insufficient funds to

---

[4] See also Accounting Principles Board Opinion No. 17, ¶ 26, p. 339 (1970) (providing that "[i]ntangible assets acquired . . . as part of an acquired company should . . . be recorded at cost," which for unidentifiable intangible assets like goodwill is "measured by the difference between the cost of the . . . enterprise acquired and the sum of the assigned costs of individual tangible and identifiable intangible assets acquired less liabilities assumed").

[5] See *Newark Morning Ledger Co.* v. *United States*, 507 U. S. 546, 556 (1993) (describing "goodwill" as "the total of all the imponderable qualities that attract customers to the business"). Justice Story defined "goodwill" somewhat more elaborately as "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities, or prejudices." J. Story, Law of Partnership § 99, p. 139 (1841).

make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a "cash substitute" to induce a healthy thrift to assume a failed thrift's obligations. Former Bank Board Chairman Richard Pratt put it this way in testifying before Congress:

> "The Bank Board . . . did not have sufficient resources to close all insolvent institutions, [but] at the same time, it had to consolidate the industry, move weaker institutions into stronger hands, and do everything possible to minimize losses during the transition period. Goodwill was an indispensable tool in performing this task." Savings and Loan Policies in the Late 1970's and 1980's: Hearings before the House Committee on Banking, Finance, and Urban Affairs, 101st Cong., 2d Sess., Ser. No. 101–176, p. 227 (1990).[6]

Supervisory goodwill was attractive to healthy thrifts for at least two reasons. First, thrift regulators let the acquiring institutions count supervisory goodwill toward their reserve requirements under 12 CFR § 563.13 (1981). This treatment was, of course, critical to make the transaction possible in the first place, because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulatory net worth. From the acquiring

---

[6] See also 135 Cong. Rec. 12061 (1989) (statement of Rep. Hyde) (observing that FSLIC used goodwill as "an inducement to the healthy savings and loans to merge with the sick ones"); Brief for Franklin Financial Group, Inc., et al. as *Amici Curiae* 9, quoting Deposition of Thurman Connell, former official at the Atlanta Federal Home Loan Bank, Joint App. in *Charter Federal Savings Bank* v. *Office of Thrift Supervision*, Nos. 91–2647, 91–2708 (CA4), p. 224 (recognizing that treating supervisory goodwill as regulatory capital was "'a very important aspect of [the acquiring thrifts'] willingness to enter into these agreements,'" and concluding that the regulators "'looked at [supervisory goodwill] as kind of the engine that made this transaction go. Because without it, there wouldn't have been any train pulling out of the station, so to speak'").

thrift's perspective, however, the treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits). See White 84; cf. Breeden, 59 Ford. L. Rev., at S75–S76 (explaining how loosening reserve requirements permits asset expansion).

A second and more complicated incentive arose from the decision by regulators to let acquiring institutions amortize the goodwill asset over long periods, up to the 40-year maximum permitted by GAAP, see Accounting Principles Board Opinion No. 17, ¶ 29, p. 340 (1970). Amortization recognizes that intangible assets such as goodwill are useful for just so long; accordingly, a business must "write down" the value of the asset each year to reflect its waning worth. See Kay & Searfoss, Handbook of Accounting and Auditing, at 15–36 to 15–37; Accounting Principles Board Opinion No. 17, *supra*, ¶ 27, at 339–340.[7] The amount of the write down is reflected on the business's income statement each year as an operating expense. See generally E. Faris, Accounting and Law in a Nutshell § 12.2(q) (1984) (describing amortization of goodwill). At the same time that it amortizes its goodwill asset,

---

[7] In this context, "amortization" of an intangible asset is equivalent to depreciation of tangible assets. See *Newark Morning Ledger Co.* v. *United States*, *supra*, at 571, n. 1 (SOUTER, J., dissenting); Gregorcich, Amortization of Intangibles: A Reassessment of the Tax Treatment of Purchased Goodwill, 28 Tax Lawyer 251, 253 (1975). Both the majority opinion and dissent in *Newark Morning Ledger* agreed that "goodwill" was not subject to depreciation (or amortization) for federal tax purposes, see 507 U. S., at 565, n. 13; *id.*, at 573 (SOUTER, J., dissenting), although we disagreed as to whether one could accurately estimate the useful life of certain elements of goodwill and, if so, permit depreciation of those elements under Internal Revenue Service regulations. *Id.*, at 566–567; *id.*, at 576–577 (SOUTER, J., dissenting). Neither of the *Newark Morning Ledger* opinions, however, denied the power of another federal agency, such as the Bank Board or FSLIC, to decide that goodwill is of transitory value and impose a particular amortization period to be used for its own regulatory purposes.

however, an acquiring thrift must also account for changes in the value of its loans, which are its principal assets. The loans acquired as assets of the failed thrift in a supervisory merger were generally worth less than their face value, typically because they were issued at interest rates below the market rate at the time of the acquisition. See Black, Ending Our Forebearers' Forbearances: FIRREA and Supervisory Goodwill, 2 Stan. L. & Policy Rev. 102, 104–105 (1990). This differential or "discount," J. Rosenberg, Dictionary of Banking and Financial Services 233 (2d ed. 1985), appears on the balance sheet as a "contra-asset" account, or a deduction from the loan's face value to reflect market valuation of the asset, R. Estes, Dictionary of Accounting 29 (1981). Because loans are ultimately repaid at face value, the magnitude of the discount declines over time as redemption approaches; this process, technically called "accretion of discount," is reflected on a thrift's income statement as a series of capital gains. See Rosenberg, *supra*, at 9; Estes, *supra*, at 39–40.

The advantage in all this to an acquiring thrift depends upon the fact that accretion of discount is the mirror image of amortization of goodwill. In the typical case, a failed thrift's primary assets were long-term mortgage loans that earned low rates of interest and therefore had declined in value to the point that the thrift's assets no longer exceeded its liabilities to depositors. In such a case, the disparity between assets and liabilities from which the accounting goodwill was derived was virtually equal to the value of the discount from face value of the thrift's outstanding loans. See Black, 2 Stan. L. & Policy Rev., at 104–105. Thrift regulators, however, typically agreed to supervisory merger terms that allowed acquiring thrifts to accrete the discount over the average life of the loans (approximately seven years), see *id.*, at 105, while permitting amortization of the goodwill asset over a much longer period. Given that goodwill and discount were substantially equal in overall values, the more rapid

accrual of capital gain from accretion resulted in a net paper profit over the initial years following the acquisition. See *ibid.;* Lowy 39–40.[8] The difference between amortization and accretion schedules thus allowed acquiring thrifts to seem more profitable than they in fact were.

Some transactions included yet a further inducement, described as a "capital credit." Such credits arose when FSLIC itself contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital. By failing to require the thrift to subtract this FSLIC contribution from the amount of supervisory goodwill generated by the merger, regulators effectively permitted double counting of the cash as both a tangible and an intangible asset. See, *e. g., Transohio Savings Bank* v. *Director, Office of Thrift Supervision,* 967 F. 2d 598, 604 (CADC 1992). Capital credits thus inflated the acquiring thrift's regulatory capital and permitted leveraging of more and more loans.

As we describe in more detail below, the accounting treatment to be accorded supervisory goodwill and capital credits was the subject of express arrangements between the regulators and the acquiring institutions. While the extent to which these arrangements constituted a departure from prior norms is less clear, an acquiring institution would rea-

---

[8] See also National Commission on Financial Institution Reform, Recovery and Enforcement, Origins and Causes of the S&L Debacle: A Blueprint for Reform, A Report to the President and Congress of the United States 38–39 (July 1993) (explaining the advantages of different amortization and accretion schedules to an acquiring thrift). The downside of a faster accretion schedule, of course, was that it exhausted the discount long before the goodwill asset had been fully amortized. As a result, this treatment resulted in a net drag on earnings over the medium and long terms. See Lowy 40–41; Black, Ending Our Forebearers' Forbearances: FIRREA and Supervisory Goodwill, 2 Stan. L. & Policy Rev. 102, 104–105 (1990). Many thrift managers were apparently willing to take the short-term gain, see Lowy 40–41, and others sought to stave off the inevitable losses by pursuing further acquisitions, see Black, *supra,* at 105.

sonably have wanted to bargain for such treatment. Although GAAP demonstrably permitted the use of the purchase method in acquiring a thrift suffering no distress, the relevant thrift regulations did not explicitly state that intangible goodwill assets created by that method could be counted toward regulatory capital. See 12 CFR § 563.13 (a)(3) (1981) (permitting thrifts to count as reserves any "items listed in the definition of net worth"); § 561.13(a) (defining "net worth" as "the sum of all reserve accounts . . . , retained earnings, permanent stock, mutual capital certificates . . . , and any other non-withdrawable accounts of an insured institution").[9] Indeed, the rationale for recognizing goodwill stands on its head in a supervisory merger: ordinarily, goodwill is recognized as valuable because a rational purchaser would not pay more than assets are worth; here, however, the purchase is rational only because of the accounting treatment for the shortfall. See Black, *supra*, at 104 ("GAAP's treatment of goodwill . . . assumes that buyers do not overpay when they purchase an S&L"). In the end, of course, such reasoning circumvented the whole purpose of the reserve requirements, which was to protect depositors and the deposit insurance fund. As some in Congress later recognized, "[g]oodwill is not cash. It is a concept, and a shadowy one at that. When the Federal Government liquidates a failed thrift, goodwill is simply no good. It is valueless. That means, quite simply, that the taxpayer picks up the tab for the shortfall." 135 Cong. Rec. 11795 (1989) (remarks of Rep. Barnard); see also White 84 (acknowledging

---

[9] The 1981 regulations quoted above were in effect at the time of the Glendale transaction. The 1984 regulations relevant to the Winstar transaction were identical in all material respects, and although substantial changes had been introduced into § 563.13 by the time of the Statesman merger in 1988, they do not appear to resolve the basic ambiguity as to whether goodwill could qualify as regulatory capital. See 12 CFR § 563.13 (1988). Section 563.13 has since been superseded by the Financial Institutions Reform, Recovery, and Enforcement Act.

that in some instances supervisory goodwill "involved the creation of an asset that did not have real value as protection for the FSLIC"). To those with the basic foresight to appreciate all this, then, it was not obvious that regulators would accept purchase accounting in determining compliance with regulatory criteria, and it was clearly prudent to get agreement on the matter.

The advantageous treatment of amortization schedules and capital credits in supervisory mergers amounted to more clear-cut departures from GAAP and, hence, subjects worthy of agreement by those banking on such treatment. In 1983, the Financial Accounting Standards Board (the font of GAAP) promulgated Statement of Financial. Accounting Standards No. 72 (SFAS 72), which applied specifically to the acquisition of a savings and loan association. SFAS 72 provided that "[i]f, and to the extent that, the fair value of liabilities assumed exceeds the fair value of identifiable assets acquired in the acquisition of a banking or thrift institution, the unidentifiable intangible asset recognized generally shall be amortized to expense by the interest method over a period no longer than the discount on the long-term interest-bearing assets acquired is to be recognized as interest income." Accounting Standards, Original Pronouncements (July 1973–June 1, 1989), p. 725. In other words, SFAS 72 eliminated any doubt that the differential amortization periods on which acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with GAAP. SFAS 72 also barred double counting of capital credits by requiring that financial assistance from regulatory authorities must be deducted from the cost of the acquisition before the amount of goodwill is determined. SFAS 72, ¶ 9.[10] Thrift acquirers relying on such credits, then, had

---

[10] Although the Glendale transaction in this case occurred before the promulgation of SFAS 72 in 1983, the proper amortization period for goodwill under GAAP was uncertain prior to that time. According to one observer, "when the accounting profession designed the purchase account-

every reason for concern as to the continued availability of the RAP in effect at the time of these transactions.

## C

Although the results of the forbearance policy, including the departures from GAAP, appear to have been mixed, see GAO, Forbearance for Troubled Institutions 4, it is relatively clear that the overall regulatory response of the early and mid-1980's was unsuccessful in resolving the crisis in the thrift industry. See, *e. g.,* *Transohio Savings Bank,* 967 F. 2d, at 602 (concluding that regulatory measures "actually aggravat[ed] the decline"). As a result, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub. L. 101–73, 103 Stat. 183, with the objects of preventing the collapse of the industry, attacking the root causes of the crisis, and restoring public confidence.

FIRREA made enormous changes in the structure of federal thrift regulation by (1) abolishing FSLIC and transferring its functions to other agencies; (2) creating a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation; (3) replacing the Bank Board with the Office of Thrift Supervision (OTS), a Treasury Department office with responsibility for the regulation of all federally insured savings associations; and (4) establishing the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets. See note following 12 U. S. C. § 1437, §§ 1441a, 1821. More importantly for the present case, FIRREA also obligated OTS to "prescribe and maintain uniformly applicable capital standards for savings associations" in accord with strict statutory re-

---

ing rules in the early 1970s, they didn't anticipate the case of insolvent thrift institutions . . . . The rules for that situation were simply unclear until September 1982," when the SFAS 72 rules were first aired. Lowy 39–40.

quirements. § 1464(t)(1)(A).[11] In particular, the statute required thrifts to "maintain core capital in an amount not less than 3 percent of the savings association's total assets," § 1464(t)(2)(A), and defined "core capital" to exclude "unidentifiable intangible assets," § 1464(t)(9)(A), such as goodwill. Although the reform provided a "transition rule" permitting thrifts to count "qualifying supervisory goodwill" toward half the core capital requirement, this allowance was phased out by 1995. § 1464(t)(3)(A). According to the House Report, these tougher capital requirements reflected a congressional judgment that "[t]o a considerable extent, the size of the thrift crisis resulted from the utilization of capital gimmicks that masked the inadequate capitalization of thrifts." House Report, at 310.

The impact of FIRREA's new capital requirements upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe. OTS promptly issued regulations implementing the new capital standards along with a bulletin noting that FIRREA "eliminates [capital and accounting] forbearances" previously granted to certain thrifts. Office of Thrift Supervision, Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments held by a Deposit Insurance Fund, Thrift Bulletin No. 38–2, Jan. 9, 1990. OTS accordingly directed that "[a]ll savings associations presently operating with these forbearances . . . should eliminate them in determining whether or not they comply with the new minimum regulatory capital standards." *Ibid.* Despite the statute's limited exception intended to moderate transitional

---

[11] See 135 Cong. Rec. 18863 (1989) (remarks of Sen. Riegle) (emphasizing that these capital requirements were at the "heart" of the legislative reform); *id.*, at 18860 (remarks of Sen. Chafee) (describing capital standards as FIRREA's "strongest and most critical requirement" and "the backbone of the legislation"); *id.*, at 18853 (remarks of Sen. Dole) (describing the "[t]ough new capital standards [as] perhaps the most important provisions in this bill").

pains, many institutions immediately fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regulators. See Black, 2 Stan. L. & Policy Rev., at 107 ("FIRREA's new capital mandates have caused over 500 S&Ls . . . to report that they have failed one or more of the three capital requirements").

### D

This case is about the impact of FIRREA's tightened capital requirements on three thrift institutions created by way of supervisory mergers. Respondents Glendale Federal Bank, FSB, Winstar Corporation, and The Statesman Group, Inc., acquired failed thrifts in 1981, 1984, and 1988, respectively. After the passage of FIRREA, federal regulators seized and liquidated the Winstar and Statesman thrifts for failure to meet the new capital requirements. Although the Glendale thrift also fell out of regulatory capital compliance as a result of the new rules, it managed to avoid seizure through a massive private recapitalization. Believing that the Bank Board and FSLIC had promised them that the supervisory goodwill created in their merger transactions could be counted toward regulatory capital requirements, respondents each filed suit against the United States in the Court of Federal Claims, seeking monetary damages on both contractual and constitutional theories. That court granted respondents' motions for partial summary judgment on contract liability, finding in each case that the Government had breached contractual obligations to permit respondents to count supervisory goodwill and capital credits toward their regulatory capital requirements. See *Winstar Corp.* v. *United States,* 21 Cl. Ct. 112 (1990) *(Winstar I)* (finding an implied-in-fact contract but requesting further briefing on contract issues); 25 Cl. Ct. 541 (1992) *(Winstar II)* (finding contract breached and entering summary judgment on liability); *Statesman Savings Holding Corp.* v. *United States,* 26 Cl. Ct. 904 (1992) (granting summary judgment on liability

to Statesman and Glendale). In so holding, the Court of Federal Claims rejected two central defenses asserted by the Government: that the Government could not be held to a promise to refrain from exercising its regulatory authority in the future unless that promise was unmistakably clear in the contract, *Winstar I, supra,* at 116; *Winstar II, supra,* at 544–549; *Statesman, supra,* at 919–920, and that the Government's alteration of the capital reserve requirements in FIRREA was a sovereign act that could not trigger contractual liability, *Winstar II, supra,* at 550–553; *Statesman, supra,* at 915–916. The Court of Federal Claims consolidated the three cases and certified its decisions for interlocutory appeal.

A divided panel of the Federal Circuit reversed, holding that the parties did not allocate to the Government, in an unmistakably clear manner, the risk of a subsequent change in the regulatory capital requirements. *Winstar Corp.* v. *United States,* 994 F. 2d 797, 811–813 (1993). The full court, however, vacated this decision and agreed to rehear the case en banc. After rebriefing and reargument, the en banc court reversed the panel decision and affirmed the Court of Federal Claims' rulings on liability. *Winstar Corp.* v. *United States,* 64 F. 3d 1531 (1995). The Federal Circuit found that FSLIC had made express contracts with respondents, including a promise that supervisory goodwill and capital credits could be counted toward satisfaction of the regulatory capital requirements. *Id.,* at 1540, 1542–1543. The court rejected the Government's unmistakability argument, agreeing with the Court of Federal Claims that that doctrine had no application in a suit for money damages. *Id.,* at 1545–1548. Finally, the en banc majority found that FIRREA's new capital requirements "single[d] out supervisory goodwill for special treatment" and therefore could not be said to be a "public" and "general act" within the meaning of the sovereign acts doctrine. *Id.,* at 1548–1551. Judge Nies dissented, essentially repeating the arguments in her

prior opinion for the panel majority, *id.*, at 1551–1552, and Judge Lourie also dissented on the ground that FIRREA was a public and general act, *id.*, at 1552–1553. We granted certiorari, 516 U. S. 1087 (1996), and now affirm.

## II

We took this case to consider the extent to which special rules, not generally applicable to private contracts, govern enforcement of the governmental contracts at issue here. We decide whether the Government may assert four special defenses to respondents' claims for breach: the canon of contract construction that surrenders of sovereign authority must appear in unmistakable terms, *Bowen* v. *Public Agencies Opposed to Social Security Entrapment,* 477 U. S. 41, 52 (1986); the rule that an agent's authority to make such surrenders must be delegated in express terms, *Home Telephone & Telegraph Co.* v. *Los Angeles,* 211 U. S. 265 (1908); the doctrine that a government may not, in any event, contract to surrender certain reserved powers, *Stone* v. *Mississippi,* 101 U. S. 814 (1880); and, finally, the principle that a Government's sovereign acts do not give rise to a claim for breach of contract, *Horowitz* v. *United States,* 267 U. S. 458, 460 (1925).

The anterior question whether there were contracts at all between the Government and respondents dealing with regulatory treatment of supervisory goodwill and capital credits, although briefed and argued by the parties in this Court, is not strictly before us. See *Yee* v. *Escondido,* 503 U. S. 519, 535 (1992) (noting that "we ordinarily do not consider questions outside those presented in the petition for certiorari"); this Court's Rule 14.1(a). And although we may review the Court of Federal Claims' grant of summary judgment *de novo, Eastman Kodak Co.* v. *Image Technical Services, Inc.,* 504 U. S. 451, 465, n. 10 (1992), we are in no better position than the Federal Circuit and the Court of Federal Claims to evaluate the documentary records of

the transactions at issue. Our resolution of the legal issues raised by the petition for certiorari, however, does require some consideration of the nature of the underlying transactions.

## A

The Federal Circuit found that "[t]he three plaintiff thrifts negotiated contracts with the bank regulatory agencies that allowed them to include supervisory goodwill (and capital credits) as assets for regulatory capital purposes and to amortize that supervisory goodwill over extended periods of time." 64 F. 3d, at 1545. Although each of these transactions was fundamentally similar, the relevant circumstances and documents vary somewhat from case to case.

## 1

In September 1981, Glendale was approached about a possible merger by the First Federal Savings and Loan Association of Broward County, which then had liabilities exceeding the fair value of its assets by over $734 million. At the time, Glendale's accountants estimated that FSLIC would have needed approximately $1.8 billion to liquidate Broward, only about $1 billion of which could be recouped through the sale of Broward's assets. Glendale, on the other hand, was both profitable and well capitalized, with a net worth of $277 million.[12] After some preliminary negotiations with the regulators, Glendale submitted a merger proposal to the Bank Board, which had to approve all mergers involving savings and loan associations, see 12 U. S. C. §§ 1467a(e)(1)(A) and (B); § 1817(j)(1); that proposal assumed the use of the purchase method of accounting to record supervisory goodwill arising from the transaction, with an amortization period of 40 years. The Bank Board ratified the merger, or "Supervisory Action Agreement" (SAA), on November 19, 1981.

---

[12] Glendale's premerger net worth amounted to 5.45 percent of its total assets, which comfortably exceeded the 4 percent capital/asset ratio, or net worth requirement, then in effect. See 12 CFR § 563.13(a)(2) (1981).

The SAA itself said nothing about supervisory goodwill, but did contain the following integration clause:

"This Agreement . . . constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith." App. 598–599.

The SAA thereby incorporated Bank Board Resolution No. 81–710, by which the Board had ratified the SAA. That resolution referred to two additional documents: a letter to be furnished by Glendale's independent accountant identifying and supporting the use of any goodwill to be recorded on Glendale's books, as well as the resulting amortization periods; and "a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Id.*, at 607. Memorandum R–31b, finally, permitted Glendale to use the purchase method of accounting and to recognize goodwill as an asset subject to amortization. See *id.*, at 571–574.

The Government does not seriously contest this evidence that the parties understood that goodwill arising from these transactions would be treated as satisfying regulatory requirements; it insists, however, that these documents simply reflect statements of then-current federal regulatory policy rather than contractual undertakings. Neither the Court of Federal Claims nor the Federal Circuit so read the record, however, and we agree with those courts that the Government's interpretation of the relevant documents is fundamentally implausible. The integration clause in Glendale's SAA with FSLIC, which is similar in all relevant respects to the analogous provisions in the Winstar and Statesman contracts, provides that the SAA supersedes "all prior agreements and understandings . . . excepting only . . . any resolutions or letters issued contemporaneously" by the Board, *id.*,

at 598–599; in other words, the SAA characterizes the Board's resolutions and letters not as statements of background rules, but as part of the "agreements and understandings" between the parties.

To the extent that the integration clause leaves any ambiguity, the other courts that construed the documents found that the realities of the transaction favored reading those documents as contractual commitments, not mere statements of policy, see Restatement (Second) of Contracts § 202(1) (1981) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight"), and we see no reason to disagree. As the Federal Circuit noted, "[i]t is not disputed that if supervisory goodwill had not been available for purposes of meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation." 64 F. 3d, at 1542. Indeed, the assumption of Broward's liabilities would have rendered Glendale immediately insolvent by approximately $460 million, but for Glendale's right to count goodwill as regulatory capital. Although one can imagine cases in which the potential gain might induce a party to assume a substantial risk that the gain might be wiped out by a change in the law, it would have been irrational in this case for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment. This conclusion is obvious from both the dollar amounts at stake and the regulators' proven propensity to make changes in the relevant requirements. See Brief for United States 26 ("[I]n light of the frequency with which federal capital requirements had changed in the past . . . , it would have been unreasonable for Glendale, FSLIC, or the Bank Board to expect or rely upon the fact that those requirements would remain unchanged"); see also *infra*, at 909–910. Under the circumstances, we have no doubt that

the parties intended to settle regulatory treatment of these transactions as a condition of their agreement.  See, *e. g.*, *The Binghamton Bridge*, 3 Wall. 51, 78 (1866) (refusing to construe charter in such a way that it would have been "madness" for private party to enter into it).[13]  We accordingly have no reason to question the Court of Appeals's conclusion that "the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes."  64 F. 3d, at 1540.

### 2

In 1983, FSLIC solicited bids for the acquisition of Windom Federal Savings and Loan Association, a Minnesota-based thrift in danger of failing.  At that time, the estimated cost to the Government of liquidating Windom was approximately $12 million.  A group of private investors formed Winstar Corporation for the purpose of acquiring Windom and submitted a merger plan to FSLIC; it called for capital contributions of $2.8 million from Winstar and $5.6 million from FSLIC, as well as for recognition of supervisory goodwill to be amortized over a period of 35 years.

The Bank Board accepted the Winstar proposal and made an Assistance Agreement that incorporated, by an integration clause much like Glendale's, both the Board's resolution approving the merger and a forbearance letter issued on the date of the agreement.  See App. 112.  The forbearance letter provided that "[f]or purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35

---

[13] See also *Appleby* v. *Delaney*, 271 U. S. 403, 413 (1926) ("It is not reasonable to suppose that the grantees would pay $12,000 . . . and leave to the city authorities the absolute right completely to nullify the chief consideration for seeking this property, . . . or that the parties then took that view of the transaction").

years by the straight-line method." *Id.*, at 123. Moreover, the Assistance Agreement itself contained an "Accounting Principles" section with the following provisions:

> "Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied on a going concern basis in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. . . . If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either." *Id.*, at 108–109.

The Government emphasizes the last sentence of this clause, which provides that the relevant accounting principles may be "subsequently clarified . . . or amended," as barring any inference that the Government assumed the risk of regulatory change. Its argument, however, ignores the preceding sentence providing that the Bank Board's resolutions and actions in connection with the merger must prevail over contrary regulations. If anything, then, the accounting principles clause tilts in favor of interpreting the contract to lock in the then-current regulatory treatment of supervisory goodwill.

In any event, we do not doubt the soundness of the Federal Circuit's finding that the overall "documentation in the Win-

star transaction establishes an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over 35 years." 64 F. 3d, at 1544. As in the Glendale transaction, the circumstances of the merger powerfully support this conclusion: The tangible net worth of the acquired institution was a negative $6.7 million, and the new Winstar thrift would have been out of compliance with regulatory capital standards from its very inception, without including goodwill in the relevant calculations. We thus accept the Court of Appeals's conclusion that "it was the intention of the parties to be bound by the accounting treatment for goodwill arising in the merger." *Ibid.*

3

Statesman, another nonthrift entity, approached FSLIC in 1987 about acquiring a subsidiary of First Federated Savings Bank, an insolvent Florida thrift. FSLIC responded that if Statesman wanted Government assistance in the acquisition it would have to acquire all of First Federated as well as three shaky thrifts in Iowa. Statesman and FSLIC ultimately agreed on a complex plan for acquiring the four thrifts; the agreement involved application of the purchase method of accounting, a $21 million cash contribution from Statesman to be accompanied by $60 million from FSLIC, and (unlike the Glendale and Winstar plans) treatment of $26 million of FSLIC's contribution as a permanent capital credit to Statesman's regulatory capital.

The Assistance Agreement between Statesman and FSLIC included an "accounting principles" clause virtually identical to Winstar's, see App. 402–403, as well as a specific provision for the capital credit:

"For the purposes of reports to the Bank Board . . . , $26 million of the contribution [made by FSLIC] shall be credited to [Statesman's] regulatory capital account

and shall constitute regulatory capital (as defined in § 561.13 of the Insurance Regulations)." *Id.*, at 362a.

As with Glendale and Winstar, the agreement had an integration clause incorporating contemporaneous resolutions and letters issued by the Board. *Id.*, at 407–408. The Board's resolution explicitly acknowledged both the capital credits and the creation of supervisory goodwill to be amortized over 25 years, *id.*, at 458–459, and the Forbearance Letter likewise recognized the capital credit provided for in the agreement. *Id.*, at 476. Finally, the parties executed a separate Regulatory Capital Maintenance Agreement stating that, "[i]n consideration of the mutual promises contained [t]herein," *id.*, at 418, Statesman would be obligated to maintain the regulatory capital of the acquired thrifts "at the level . . . required by § 563.13(b) of the Insurance Regulations . . . or any successor regulation . . . ." The agreement further provided, however, that "[f]or purposes of this Agreement, any determination of [Statesman's] Required Regulatory Capital . . . shall include . . . amounts permitted by the FSLIC in the Assistance Agreement and in the forbearances issued in connection with the transactions discussed herein." *Id.*, at 418–419. Absent those forbearances, Statesman's thrift would have remained insolvent by almost $9 million despite the cash infusions provided by the parties to the transaction.

For the same reasons set out above with respect to the Glendale and Winstar transactions, we accept the Federal Circuit's conclusion that "the government was contractually obligated to recognize the capital credits and the supervisory goodwill generated by the merger as part of the Statesman's regulatory capital requirement and to permit such goodwill to be amortized on a straight line basis over 25 years." 64 F. 3d, at 1543. Indeed, the Government's position is even weaker in Statesman's case because the capital credits portion of the agreement contains an express commitment to include those credits in the calculation of regulatory capital.

The Government asserts that the reference to § 563.13 of FSLIC regulations, which at the time defined regulatory capital for thrift institutions, indicates that the Government's obligations could change along with the relevant regulations. But, just as in Winstar's case, the Government would have us overlook the specific incorporation of the then-current regulations as part of the agreement.[14] The Government also cites a provision requiring Statesman to "comply in all material respects with all applicable statutes, regulations, orders of, and restrictions imposed by the United States or . . . by any agency of [the United States]," App. 407, but this simply meant that Statesman was required to observe FIRREA's new capital requirements once they were promulgated. The clause was hardly necessary to oblige Statesman to obey the law, and nothing in it barred Statesman from asserting that passage of that law required the Government to take action itself or be in breach of its contract.

### B

It is important to be clear about what these contracts did and did not require of the Government. Nothing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction is true of the Winstar and Statesman deals as well: "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected" in the agreements between the parties. 64 F. 3d, at 1541–1542. We read this promise as the law of contracts has always treated promises to provide something beyond the promi-

---

[14] As part of the contract, the Government's promise to count supervisory goodwill and capital credits toward regulatory capital was alterable only by written agreement of the parties. See App. 408. This was also true of the Glendale and Winstar transactions. See id., at 112, 600.

sor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.[15]   Holmes's example is famous: "[i]n the case of a binding promise that it shall rain to-morrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee." Holmes, The Common Law (1881), in 3 The Collected Works of Justice Holmes 268 (S. Novick ed. 1995).[16]   Contracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows.   The drafters of the Restatement attested to this when they explained that, "[w]ith the trend toward greater governmental regulation . . . parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions . . . ."   Restatement (Second) of Contracts § 264, Comment *a*.   "Such an agreement," according to the Restatement, "is usually interpreted as one to pay

---

[15] To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. See, *e. g., Guaranty Financial Services, Inc.* v. *Ryan,* 928 F. 2d 994, 999–1000 (CA11 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift).   The failure to be even more explicit is perhaps more surprising here, given the size and complexity of these transactions.   But few contract cases would be in court if contract language had articulated the parties' postbreach positions as clearly as might have been done, and the failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all.   The Court of Claims and Federal Circuit were thus left with the familiar task of determining which party's interpretation was more nearly supported by the evidence.

[16] See also *Day* v. *United States,* 245 U. S. 159, 161 (1917) (Holmes, J.) ("One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking").

damages if performance is prevented rather than one to render a performance in violation of law." *Ibid.*[17]

When the law as to capital requirements changed in the present instance, the Government was unable to perform its promise and, therefore, became liable for breach. We accept the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U. S. C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth. 64 F. 3d, at 1545. In the case of Winstar and Statesman, the Government exacerbated its breach when it seized and liquidated respondents' thrifts for regulatory noncompliance. *Ibid.*

In evaluating the relevant documents and circumstances, we have, of course, followed the Federal Circuit in applying

---

[17] See, *e. g., Hughes Communications Galaxy, Inc.* v. *United States,* 998 F. 2d 953, 957–959 (CA Fed. 1993) (interpreting contractual incorporation of then-current Government policy on space shuttle launches not as a promise not to change that policy, but as a promise "to bear the cost of changes in launch priority and scheduling resulting from the revised policy"); *Hills Materials Co.* v. *Rice,* 982 F. 2d 514, 516–517 (CA Fed. 1992) (interpreting contract to incorporate safety regulations extant when contract was signed and to shift responsibility for costs incurred as a result of new safety regulations to the Government); see generally 18 W. Jaeger, Williston on Contracts § 1934, pp. 19–21 (3d ed. 1978) ("Although a warranty in effect is a promise to pay damages if the facts are not as warranted, in terms it is an undertaking that the facts exist. And in spite of occasional statements that an agreement impossible in law is void there seems no greater difficulty in warranting the legal possibility of a performance than its possibility in fact . . . . [T]here seems no reason of policy forbidding a contract to perform a certain act legal at the time of the contract if it remains legal at the time of performance, and if not legal, to indemnify the promisee for non-performance" (footnotes omitted)); 5A A. Corbin, Corbin on Contracts § 1170, p. 254 (1964) (noting that in some cases where subsequent legal change renders contract performance illegal, "damages are still available as a remedy, either because the promisor assumed the risk or for other reasons," but specific performance will not be required).

ordinary principles of contract construction and breach that would be applicable to any contract action between private parties. The Government's case, however, is that the Federal Circuit's decision to apply ordinary principles was error for a variety of reasons, each of which we consider, and reject, in the sections ahead.

### III

The Government argues for reversal, first, on the principle that "contracts that limit the government's future exercises of regulatory authority are strongly disfavored; such contracts will be recognized only rarely, and then only when the limitation on future regulatory authority is expressed in unmistakable terms." Brief for United States 16. Hence, the Government says, the agreements between the Bank Board, FSLIC, and respondents should not be construed to waive Congress's authority to enact a subsequent bar to using supervisory goodwill and capital credits to meet regulatory capital requirements.

The argument mistakes the scope of the unmistakability doctrine. The thrifts do not claim that the Bank Board and FSLIC purported to bind Congress to ossify the law in conformity to the contracts; they seek no injunction against application of FIRREA's new capital requirements to them and no exemption from FIRREA's terms. They simply claim that the Government assumed the risk that subsequent changes in the law might prevent it from performing, and agreed to pay damages in the event that such failure to perform caused financial injury. The question, then, is not whether Congress could be constrained but whether the doctrine of unmistakability is applicable to any contract claim against the Government for breach occasioned by a subsequent Act of Congress. The answer to this question is no.

### A

The unmistakability doctrine invoked by the Government was stated in *Bowen* v. *Public Agencies Opposed to Social*

*Security Entrapment:* " '[S]overeign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' " 477 U. S., at 52 (quoting *Merrion* v. *Jicarilla Apache Tribe,* 455 U. S. 130, 148 (1982)). This doctrine marks the point of intersection between two fundamental constitutional concepts, the one traceable to the theory of parliamentary sovereignty made familiar by Blackstone, the other to the theory that legislative power may be limited, which became familiar to Americans through their experience under the colonial charters, see G. Wood, Creation of the American Republic 1776–1787, pp. 268–271 (1969).

In his Commentaries, Blackstone stated the centuries-old concept that one legislature may not bind the legislative authority of its successors:

> "Acts of parliament derogatory from the power of subsequent parliaments bind not. . . . Because the legislature, being in truth the sovereign power, is always of equal, always of absolute authority: it acknowledges no superior upon earth, which the prior legislature must have been, if it's *[sic]* ordinances could bind the present parliament." 1 W. Blackstone, Commentaries on the Laws of England 90 (1765).[18]

In England, of course, Parliament was historically supreme in the sense that no "higher law" limited the scope of legislative action or provided mechanisms for placing legally enforceable limits upon it in specific instances; the power of American legislative bodies, by contrast, is subject to the overriding dictates of the Constitution and the obligations that it authorizes. See Eule, Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity, 1987 Am.

---

[18] See also H. Hart, The Concept of Law 145 (1961) (recognizing that Parliament is "sovereign, in the sense that it is free, at every moment of its existence as a continuing body, not only from legal limitations imposed *ab extra,* but also from its own prior legislation").

Bar Found. Research J. 379, 392–393 (observing that the English rationale for precluding a legislature from binding its successors does not apply in America). Hence, although we have recognized that "a general law . . . may be repealed, amended or disregarded by the legislature which enacted it," and "is not binding upon any subsequent legislature," *Manigault* v. *Springs*, 199 U. S. 473, 487 (1905),[19] on this side of the Atlantic the principle has always lived in some tension with the constitutionally created potential for a legislature, under certain circumstances, to place effective limits on its successors, or to authorize executive action resulting in such a limitation.

The development of this latter, American doctrine in federal litigation began in cases applying limits on state sovereignty imposed by the National Constitution. Thus Chief Justice Marshall's exposition in *Fletcher* v. *Peck*, 6 Cranch 87 (1810), where the Court held that the Contract Clause, U. S. Const., Art. I, § 10, cl. 1, barred the State of Georgia's effort to rescind land grants made by a prior state legislature. Marshall acknowledged "that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature." 6 Cranch, at 135. "The correctness of this principle, so far as respects general legislation," he said, "can never be controverted." *Ibid.* Marshall went on to qualify the principle, however, noting that "if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power." *Ibid.* For Marshall, this was true for the two distinct reasons that the intrusion on vested rights by the Georgia Legislature's Act of repeal might well have gone beyond the limits of "the

---

[19] See also *Reichelderfer* v. *Quinn*, 287 U. S. 315, 318 (1932) ("[T]he will of a particular Congress . . . does not impose itself upon those to follow in succeeding years"); Black, Amending the Constitution: A Letter to a Congressman, 82 Yale L. J. 189, 191 (1972) (characterizing this "most familiar and fundamental principl[e]" as "so obvious as rarely to be stated").

legislative power," and that Georgia's legislative sovereignty was limited by the Federal Constitution's bar against laws impairing the obligation of contracts. *Id.*, at 135–136.

The impetus for the modern unmistakability doctrine was thus Chief Justice Marshall's application of the Contract Clause to public contracts. Although that Clause made it possible for state legislatures to bind their successors by entering into contracts, it soon became apparent that such contracts could become a threat to the sovereign responsibilities of state governments. Later decisions were accordingly less willing to recognize contractual restraints upon legislative freedom of action, and two distinct limitations developed to protect state regulatory powers. One came to be known as the "reserved powers" doctrine, which held that certain substantive powers of sovereignty could not be contracted away. See *West River Bridge Co.* v. *Dix,* 6 How. 507 (1848) (holding that a State's contracts do not surrender its eminent domain power).[20] The other, which surfaced somewhat earlier in *Providence Bank* v. *Billings,* 4 Pet. 514 (1830), and *Proprietors of Charles River Bridge* v. *Proprietors of Warren Bridge,* 11 Pet. 420 (1837), was a canon of construction disfavoring implied governmental obligations in public contracts. Under this rule that "[a]ll public grants are strictly construed," *The Delaware Railroad Tax,* 18 Wall. 206, 225 (1874), we have insisted that "[n]othing can be taken against the State by presumption or inference," *ibid.*, and that "neither the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless

---

[20] See also *Stone* v. *Mississippi,* 101 U. S. 814 (1880) (State may not contract away its police power); *Butchers' Union Slaughter-House & Live-Stock Landing Co.* v. *Crescent City Live-Stock Landing & Slaughter-House Co.,* 111 U. S. 746 (1884) (same); see generally Griffith, Local Government Contracts: Escaping from the Governmental/Proprietary Maze, 75 Iowa L. Rev. 277, 290–299 (1990) (recounting the early development of the reserved powers doctrine). We discuss the application of the reserved powers doctrine to this case *infra*, at 888–889.

such surrender has been expressed in terms too plain to be mistaken." *Jefferson Branch Bank* v. *Skelly*, 1 Black 436, 446 (1862).

The posture of the government in these early unmistakability cases is important. In each, a state or local government entity had made a contract granting a private party some concession (such as a tax exemption or a monopoly), and a subsequent governmental action had abrogated the contractual commitment. In each case, the private party was suing to invalidate the abrogating legislation under the Contract Clause. A requirement that the government's obligation unmistakably appear thus served the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power. Cf. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring) (same).

The same function of constitutional avoidance has marked the expansion of the unmistakability doctrine from its Contract Clause origins dealing with state grants and contracts to those of other governmental sovereigns, including the United States. See *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S., at 148 (deriving the unmistakability principle from *St. Louis* v. *United Railways Co.*, 210 U. S. 266 (1908), a Contract Clause suit against a state government).[21] Although

---

[21] *United Railways* is in the line of cases stretching back to *Providence Bank* v. *Billings*, 4 Pet. 514 (1830), and *Proprietors of Charles River Bridge* v. *Proprietors of Warren Bridge*, 11 Pet. 420 (1837). Justice Day's opinion in *United Railways* relied heavily upon *New Orleans City & Lake R. Co.* v. *New Orleans*, 143 U. S. 192 (1892), which in turn relied upon

the Contract Clause has no application to acts of the United States, *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717, 732, n. 9 (1984), it is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights, see, *e. g., Perry* v. *United States,* 294 U. S. 330 (1935); *Lynch* v. *United States,* 292 U. S. 571 (1934). The extent of that capacity, to be sure, remains somewhat obscure. Compare, *e. g., United States Trust Co. of N. Y.* v. *New Jersey,* 431 U. S. 1, 26 (1977) (heightened Contract Clause scrutiny when States abrogate their own contractual obligations), with *Pension Benefit Guaranty Corporation, supra,* at 733 (contrasting less exacting due process standards governing federal economic legislation affecting private contracts). But the want of more developed law on limitations independent of the Contract Clause is in part the result of applying the unmistakability canon of construction to avoid this doctrinal thicket, as we have done in several cases involving alleged surrenders of sovereign prerogatives by the National Government and Indian tribes.

First, we applied the doctrine to protect a tribal sovereign in *Merrion* v. *Jicarilla Apache Tribe, supra,* which held that long-term oil and gas leases to private parties from an Indian Tribe, providing for specific royalties to be paid to the Tribe, did not limit the Tribe's sovereign prerogative to tax the proceeds from the lessees' drilling activities. *Id.,* at 148.

---

classic Contract Clause unmistakability cases like *Vicksburg S. & P. R. Co.* v. *Dennis,* 116 U. S. 665 (1886), *Memphis Gas Light Co.* v. *Taxing Dist. of Shelby Cty.,* 109 U. S. 398 (1883), and *Piqua Branch of State Bank of Ohio* v. *Knoop,* 16 How. 369 (1854). And *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 (1934), upon which *Merrion* also relied, cites *Charles River Bridge* directly. See 290 U. S., at 435; see also Note, Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty, 92 Colum. L. Rev. 426, 453 (1992) (linking the unmistakability principle applied in *Bowen* v. *Public Agencies Opposed to Social Security Entrapment,* 477 U. S. 41 (1986), to the *Charles River Bridge/Providence Bank* line of cases).

Because the lease made no reference to the Tribe's taxing power, we held simply that a waiver of that power could not be "inferred . . . from silence," *ibid.*, since the taxing power of any government remains "unless it is has been specifically surrendered in terms which admit of no other reasonable interpretation." *Ibid.* (internal quotation marks and citation omitted).

In *Bowen* v. *Public Agencies Opposed to Social Security Entrapment*, 477 U. S. 41 (1986), this Court confronted a state claim that § 103 of the Social Security Amendments Act of 1983, 97 Stat. 71, 42 U. S. C. § 418(g) (1982 ed., Supp. II), was unenforceable to the extent it was inconsistent with the terms of a prior agreement with the National Government. Under the law before 1983, a State could agree with the Secretary of Health and Human Services to cover the State's employees under the Social Security scheme subject to a right to withdraw them from coverage later. When the 1983 Act eliminated the right of withdrawal, the State of California and related plaintiffs sought to enjoin application of the new law to them, or to obtain just compensation for loss of the withdrawal right (a remedy which the District Court interpreted as tantamount to the injunction, since it would mandate return of all otherwise required contributions, see 477 U. S., at 51). Although we were able to resolve the case by reading the terms of a state-federal coverage agreement to reserve the Government's right to modify its terms by subsequent legislation, in the alternative we rested the decision on the more general principle that, absent an "unmistakable" provision to the contrary, "contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign." *Id.*, at 52 (quoting *Merrion, supra,* at 147). We thus rejected the proposal "to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract," *Bowen, supra,* at 52 (quoting *Merrion, supra,* at 148), and

held instead that unmistakability was needed for waiver, not reservation.

Most recently, in *United States* v. *Cherokee Nation of Okla.*, 480 U. S. 700 (1987), we refused to infer a waiver of federal sovereign power from silence. There, an Indian Tribe with property rights in a riverbed derived from a Government treaty sued for just compensation for damage to its interests caused by the Government's navigational improvements to the Arkansas River. The claim for compensation presupposed, and was understood to presuppose, that the Government had conveyed to the Tribe its easement to control navigation; absent that conveyance, the Tribe's property included no right to be free from the Government's riverbed improvements. *Id.*, at 704. We found, however, that the treaty said nothing about conveying the Government's navigational easement, see *id.*, at 706, which we saw as an aspect of sovereignty. This, we said, could be " 'surrendered [only] in unmistakable terms,' " *id.*, at 707 (quoting *Bowen, supra,* at 52), if indeed it could be waived at all.

*Merrion, Bowen,* and *Cherokee Nation* thus announce no new rule distinct from the canon of construction adopted in *Providence Bank* and *Charles River Bridge;* their collective holding is that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power. The cases extending back into the 19th century thus stand for a rule that applies when the Government is subject either to a claim that its contract has surrendered a sovereign power [22] (*e. g.,* to tax or

---

[22] "Sovereign power" as used here must be understood as a power that could otherwise affect the Government's obligation under the contract. The Government could not, for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government con-

control navigation), or to a claim that cannot be recognized without creating an exemption from the exercise of such a power (*e. g.,* the equivalent of exemption from Social Security obligations). The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government.

Since the criterion looks to the effect of a contract's enforcement, the particular remedy sought is not dispositive and the doctrine is not rendered inapplicable by a request for damages, as distinct from specific performance. The respondents in *Cherokee Nation* sought nothing beyond damages, but the case still turned on the unmistakability doctrine because there could be no claim to harm unless the right to be free of the sovereign power to control navigation had been conveyed away by the Government.[23] So, too, in *Bowen:* the sole relief sought was dollars and cents, but the award of damages as requested would have been the

---

tracts. No such legislation would provide the Government with a defense under the sovereign acts doctrine, see *infra,* at 891–899.

[23] The Government's right to take the Tribe's property upon payment of compensation, of course, did not depend upon the navigational servitude; where it applies, however, the navigational easement generally obviates the obligation to pay compensation at all. See, *e. g., United States* v. *Kansas City Life Ins. Co.,* 339 U. S. 799, 808 (1950) ("When the Government exercises [the navigational] servitude, it is exercising its paramount power in the interest of navigation, rather than taking the private property of anyone"); *Scranton* v. *Wheeler,* 179 U. S. 141, 163 (1900) ("Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title . . . to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation"). Because an order to pay compensation would have placed the Government in the same position as if the navigational easement had been surrendered altogether, the holding of *Cherokee Nation* is on all fours with the approach we describe today.

equivalent of exemption from the terms of the subsequent statute.

The application of the doctrine will therefore differ according to the different kinds of obligations the Government may assume and the consequences of enforcing them. At one end of the wide spectrum are claims for enforcement of contractual obligations that could not be recognized without effectively limiting sovereign authority, such as a claim for rebate under an agreement for a tax exemption. Granting a rebate, like enjoining enforcement, would simply block the exercise of the taxing power, cf. *Bowen*, 477 U. S., at 51, and the unmistakability doctrine would have to be satisfied.[24] At the other end are contracts, say, to buy food for the army; no sovereign power is limited by the Government's promise to purchase and a claim for damages implies no such limitation. That is why no one would seriously contend that enforcement of humdrum supply contracts might be subject to the unmistakability doctrine. Between these extremes lies an enormous variety of contracts including those under which performance will require exercise (or not) of a power peculiar to the Government. So long as such a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it.

---

[24] The dissent is mistaken in suggesting there is question begging in speaking of what a Government contract provides without first applying the unmistakability doctrine, see *post*, at 929. A contract may reasonably be read under normal rules of construction to contain a provision that does not satisfy the more demanding standard of unmistakable clarity. If an alleged term could not be discovered under normal standards, there would be no need for an unmistakability doctrine. It would, of course, make good sense to apply the unmistakability rule if it was clear from the start that a contract plaintiff could not obtain the relief sought without effectively barring exercise of a sovereign power, as in the example of the promisee of the tax exemption who claims a rebate.

The Government argues that enforcement of the contracts in this case would implicate the unmistakability principle, with the consequence that *Merrion, Bowen,* and *Cherokee Nation* are good authorities for rejecting respondents' claims. The Government's position is mistaken, however, for the complementary reasons that the contracts have not been construed as binding the Government's exercise of authority to modify banking regulation or of any other sovereign power, and there has been no demonstration that awarding damages for breach would be tantamount to any such limitation.

As construed by each of the courts that considered these contracts before they reached us, the agreements do not purport to bind the Congress from enacting regulatory measures, and respondents do not ask the courts to infer from silence any such limit on sovereign power as would violate the holdings of *Merrion* and *Cherokee Nation.* The contracts have been read as solely risk-shifting agreements and respondents seek nothing more than the benefit of promises by the Government to insure them against any losses arising from future regulatory change. They seek no injunction against application of the law to them, as the plaintiffs did in *Bowen* and *Merrion,* cf. *Reichelderfer* v. *Quinn,* 287 U. S. 315 (1932), and they acknowledge that the Bank Board and FSLIC could not bind Congress (and possibly could not even bind their future selves) not to change regulatory policy.

Nor do the damages respondents seek amount to exemption from the new law, in the manner of the compensation sought in *Bowen,* see 477 U. S., at 51. Once general jurisdiction to make an award against the Government is conceded, a requirement to pay money supposes no surrender of sovereign power by a sovereign with the power to contract. See, *e. g., Amino Bros. Co.* v. *United States,* 178 Ct. Cl. 515, 525, 372 F. 2d 485, 491 ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other

contracting party the amount by which its costs are increased by the Government's sovereign act"), cert. denied, 389 U. S. 846 (1967).[25]  Even if respondents were asking that the Government be required to make up any capital deficiency arising from the exclusion of goodwill and capital credits from the relevant calculations, such relief would hardly amount to an exemption from the capital requirements of FIRREA; after all, Glendale (the only respondent thrift still in operation) would still be required to maintain adequate tangible capital reserves under FIRREA, and the purpose of the statute, the protection of the insurance fund, would be served.  Nor would such a damages award deprive the Government of money it would otherwise be entitled to receive (as a tax rebate would), since the capital require-

---

[25] See also *Hughes Communications Galaxy, Inc.* v. *United States*, 998 F. 2d, at 958 (finding the unmistakability doctrine inapplicable to "the question of how liability for certain contingencies was allocated by the contract"); *Sunswick Corp.* v. *United States*, 109 Ct. Cl. 772, 798, 75 F. Supp. 221, 228 ("We know of no reason why the Government may not by the terms of its contract bind itself for the consequences of some act on its behalf which, but for the contract, would be nonactionable as an act of the sovereign.  As shown in *United States* v. *Bostwick*, 94 U. S. 53, 69 [(1877)], the liability of the Government in such circumstances rests upon the contract and not upon the act of the Government in its sovereign capacity"), cert. denied, 334 U. S. 827 (1948); see generally Eule, Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity, 1987 Am. Bar Found. Research J. 379, 424 (observing that limiting the Government's obligation to "compensating for the financial losses its repudiations engender . . . affords the current legislature the freedom to respond to constituents' needs, while at the same time protecting those whose contractual interests are impaired"); Note, A Procedural Approach to the Contract Clause, 93 Yale L. J. 918, 928–929 (1984) ("A damage remedy is superior to an injunction because damages provide the states with the flexibility to impair contracts retroactively when the benefits exceed the costs.  So long as the victims of contract impairments are made whole through compensation, there is little reason to grant those victims an injunctive remedy").

ments of FIRREA govern only the allocation of resources to a thrift and require no payments to the Government at all.[26]

We recognize, of course, that while agreements to insure private parties against the costs of subsequent regulatory change do not directly impede the exercise of sovereign power, they may indirectly deter needed governmental regulation by raising its costs. But all regulations have their costs, and Congress itself expressed a willingness to bear the costs at issue here when it authorized FSLIC to "guarantee [acquiring thrifts] against loss" that might occur as a result of a supervisory merger. 12 U. S. C. § 1729(f)(2) (1988 ed.) (repealed 1989). Just as we have long recognized that the Constitution " 'bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,' " *Dolan* v. *City of Tigard*, 512 U. S. 374, 384 (1994) (quoting *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960)), so we must reject the suggestion that the Government may simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change.

The Government's position would not only thus represent a conceptual expansion of the unmistakability doctrine beyond its historical and practical warrant, but would place the doctrine at odds with the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies. Consider the procurement con-

---

[26] This point underscores the likelihood that damages awards will have the same effect as an injunction only in cases, like *Bowen*, where a private party seeks the return of payments to the Government. The classic examples, of course, are tax cases like *St. Louis* v. *United Railways Co.*, 210 U. S. 266 (1908). Because a request for rebate damages in that case would effectively have exempted the plaintiffs from the law by forcing the reimbursement of their tax payments, the dissent is quite wrong to suggest, see *post*, at 928–929, that the plaintiffs could have altered the outcome by pleading their case differently.

tracts that can be affected by congressional or executive scale backs in federal regulatory or welfare activity; or contracts to substitute private service providers for the Government, which could be affected by a change in the official philosophy on privatization; or all the contracts to dispose of federal property, surplus or otherwise. If these contracts are made in reliance on the law of contract and without specific provision for default mechanisms,[27] should all the private contractors be denied a remedy in damages unless they satisfy the unmistakability doctrine? The answer is obviously no because neither constitutional avoidance nor any apparent need to protect the Government from the consequences of standard operations could conceivably justify applying the doctrine. Injecting the opportunity for unmistakability litigation into every common contract action would, however, produce the untoward result of compromising the Government's practical capacity to make contracts, which we have held to be "of the essence of sovereignty" itself. *United States* v. *Bekins*, 304 U. S. 27, 51–52 (1938).[28] From a practical standpoint, it would make an inroad on this power, by expanding the Government's opportunities for contractual abrogation, with the certain result of undermining the Government's credibility at the bargaining table and increasing the cost of its engagements. As Justice Brandeis

---

[27] See Posner & Rosenfield, Impossibility and Related Doctrines in Contract Law: An Economic Analysis, 6 J. Legal Studies 83, 88–89 (1977) (noting that parties generally rely on contract law "to reduce the costs of contract negotiation by supplying contract terms that the parties would probably have adopted explicitly had they negotiated over them").

[28] See also *Bowen* v. *Public Agencies Opposed to Social Security Entrapment*, 477 U. S., at 52 ("[T]he Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights . . ."); *Perry* v. *United States*, 294 U. S. 330, 353 (1935) ("[T]he right to make binding obligations is a competence attaching to sovereignty"); cf. Hart, The Concept of Law, at 145–146 (noting that the ability to limit a body's future authority is itself one aspect of sovereignty).

recognized, "[p]unctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors." *Lynch* v. *United States*, 292 U. S., at 580.[29]

The dissent's only answer to our concern is to recognize that "Congress may not simply abrogate a statutory provision obligating performance without breaching the contract and rendering itself liable for damages." *Post*, at 929 (citing *Lynch, supra*, at 580). Yet the only grounds that statement suggests for distinguishing *Lynch* from the present case is that there the contractual obligation was embodied in a statute. Putting aside the question why this distinction should make any difference, we note that the dissent seemingly does not deny that its view would apply the unmistakability doctrine to the vast majority of governmental contracts, which would be subject to abrogation arguments based on subsequent sovereign acts. Indeed, the dissent goes so far as to argue that our conclusion that damages are available for breach even where the parties did not specify a remedy in the contract depends upon "reading of additional terms into the contract." *Post*, at 930. That, of course, is not the law; damages are always the default remedy for breach of contract.[30] And we suspect that most Government contractors would be quite surprised by the dissent's conclusion that, where they have failed to require an express provision that

---

[29] See also Logue, Tax Transitions, Opportunistic Retroactivity, and the Benefits of Government Precommitment, 94 Mich. L. Rev. 1129, 1146 (1996) ("If we allowed the government to break its contractual promises without having to pay compensation, such a policy would come at a high cost in terms of increased default premiums in future government contracts and increased disenchantment with the government generally").

[30] See, *e. g.*, Restatement (Second) of Contracts § 346, Comment *a* (1981) ("Every breach of contract gives the injured party a right to damages against the party in breach" unless "[t]he parties . . . by agreement vary the rules"); 3 E. Farnsworth, Contracts § 12.8, p. 185 (1990) ("The award of damages is the common form of relief for breach of contract. Virtually any breach gives the injured party a claim for damages").

damages will be available for breach, that remedy must be "implied in law" and therefore unavailable under the Tucker Act, *ibid.*

Nor can the dissenting view be confined to those contracts that are "regulatory" in nature. Such a distinction would raise enormous analytical difficulties; one could ask in this case whether the Government as contractor was regulating or insuring. The dissent understandably does not advocate such a distinction, but its failure to advance any limiting principle at all would effectively compromise the Government's capacity as a reliable, straightforward contractor whenever the subject matter of a contract might be subject to subsequent regulation, which is most if not all of the time.[31] Since the facts of the present case demonstrate that the Government may wish to further its regulatory goals through contract, we are unwilling to adopt any rule of construction that would weaken the Government's capacity to do business by converting every contract it makes into an arena for unmistakability litigation.

In any event, we think the dissent goes fundamentally wrong when it concludes that "the issue of remedy for . . . breach" can arise only "[i]f the sovereign did surrender its power unequivocally." *Post,* at 929. This view ignores the

---

[31] The dissent justifies its all-devouring view of unmistakability not by articulating any limit, but simply by reminding us that "'[m]en must turn square corners when they deal with the Government.'" *Post,* at 937 (quoting *Rock Island, A. & L. R. Co.* v. *United States,* 254 U. S. 141, 143 (1920) (Holmes, J.)). We have also recognized, however, that "'[i]t is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.'" *Heckler* v. *Community Health Services of Crawford Cty., Inc.,* 467 U. S. 51, 61, n. 13 (1984) (quoting *St. Regis Paper Co.* v. *United States,* 368 U. S. 208, 229 (1961) (Black, J., dissenting). See also *Federal Crop Ins. Corp.* v. *Merrill,* 332 U. S. 380, 387–388 (1947) (Jackson, J., dissenting) ("It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street").

other, less remarkable possibility actually found by both courts that construed these contracts: that the Government agreed to do something that did not implicate its sovereign powers at all, that is, to indemnify its contracting partners against financial losses arising from regulatory change. We accordingly hold that the Federal Circuit correctly refused to apply the unmistakability doctrine here. See 64 F. 3d, at 1548. There being no need for an unmistakably clear "second promise" not to change the capital requirements, it is sufficient that the Government undertook an obligation that it subsequently found itself unable to perform. This conclusion does not, of course, foreclose the assertion of a defense that the contracts were ultra vires or that the Government's obligation should be discharged under the common-law doctrine of impossibility, see *infra*, at 888–891, 904–910, but nothing in the nature of the contracts themselves raises a bar to respondents' claims for breach.[32]

---

[32] JUSTICE SCALIA offers his own theory of unmistakability, see *post*, at 919–922, which would apply in a wide range of cases and so create some tension with the general principle that the Government is ordinarily treated just like a private party in its contractual dealings, see, *e. g.*, *Perry* v. *United States*, 294 U. S., at 352, but which would be satisfied by an inference of fact and therefore offer a only a low barrier to litigation of constitutional issues if a party should, in fact, prove a governmental promise not to change the law. JUSTICE SCALIA seeks to minimize the latter concern by quoting Holmes's pronouncement on damages as the exclusive remedy at law for breach of contract, see *post*, at 919–920, but this ignores the availability of specific performance in a nontrivial number of cases, see, *e. g.*, Restatement (Second) of Contracts §§ 357–359, including the Contract Clause cases in which the unmistakability doctrine itself originated. See, *e. g.*, *Carter* v. *Greenhow*, 114 U. S. 317, 322 (1885) (stating that "the only right secured" by the Contract Clause is "to have a judicial determination, declaring the nullity of the attempt to impair [the contract's] obligation"); Note, Takings Law and the Contract Clause: A Takings Law Approach to Legislative Modifications of Public Contracts, 36 Stan. L. Rev. 1447, 1462 (1984) (suggesting that "analysis under the contract clause is limited to declaring the statute unconstitutional. The provision does not authorize the courts to award damages in lieu of requiring the state to adhere to the original terms of the contract"); cf. C. Fried, Contract as Promise 117–

## B

The answer to the Government's unmistakability argument also meets its two related contentions on the score of ultra vires: that the Bank Board and FSLIC had no authority to bargain away Congress's power to change the law in the future, and that we should in any event find no such authority conferred without an express delegation to that effect. The first of these positions rests on the reserved powers doctrine, developed in the course of litigating claims that States had violated the Contract Clause. See *supra*, at 874. It holds that a state government may not contract away "an essential attribute of its sovereignty," *United States Trust*, 431 U. S., at 23, with the classic example of its limitation on the scope of the Contract Clause being found in *Stone* v. *Mississippi*, 101 U. S. 814 (1880). There a corporation bargained for and received a state legislative charter to conduct lotteries, only to have them outlawed by statute a year later. This Court rejected the argument that the charter immunized the corporation from the operation of the statute, holding that "the legislature cannot bargain away the police power of a State." *Id.*, at 817.[33]

The Government says that "[t]he logic of the doctrine . . . applies equally to contracts alleged to have been made by the federal government." Brief for United States 38. This

---

118 (1981) (arguing that "Holmes's celebrated dictum . . . goes too far, is too simple"). Finally, we have no need to consider the close relationship that JUSTICE SCALIA sees between the unmistakability and sovereign acts doctrines, see *post*, at 923–924, because, even considered separately, neither one favors the Government in this case.

[33] See also *Atlantic Coast Line R. Co.* v. *Goldsboro*, 232 U. S. 548, 558 (1914) ("[T]he power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community . . . can neither be abdicated nor bargained away, and is inalienable even by express grant"); *West River Bridge Co.* v. *Dix*, 6 How. 507 (1848) (State's contracts do not relinquish its eminent domain power).

may be so but is also beside the point, for the reason that the Government's ability to set capital requirements is not limited by the Bank Board's and FSLIC's promises to make good any losses arising from subsequent regulatory changes. See *supra*, at 882–883. The answer to the Government's contention that the State cannot barter away certain elements of its sovereign power is that a contract to adjust the risk of subsequent legislative change does not strip the Government of its legislative sovereignty.[34]

The same response answers the Government's demand for express delegation of any purported authority to fetter the exercise of sovereign power. It is true, of course, that in *Home Telephone & Telegraph Co.* v. *Los Angeles*, 211 U. S., at 273, we said that "[t]he surrender, by contract, of a power of government, though in certain well-defined cases it may be made by legislative authority, is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized." Hence, where "a contract has the effect of extinguishing *pro tanto* an undoubted power of government," we have insisted that "both [the contract's] existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power." *Ibid.* But *Home Telephone & Telegraph* simply has no application to the pres-

---

[34] To the extent that JUSTICE SCALIA finds the reserved powers doctrine inapplicable because "the private party to the contract does not seek to stay the exercise of sovereign authority, but merely requests damages for breach of contract," *post*, at 923, he appears to adopt a distinction between contracts of indemnity and contracts not to change the law similar to the unmistakability analysis he rejects. He also suggests that the present case falls outside the "core governmental powers" that cannot be surrendered under the reserved powers doctrine, but this suggestion is inconsistent with our precedents. See *Stone* v. *Mississippi*, 101 U. S. 814, 817 (1880) ("[T]he legislature cannot bargain away the police power of a State"); *Veix* v. *Sixth Ward Building & Loan Assn. of Newark*, 310 U. S. 32, 38 (1940) (recognizing that thrift regulation is within the police power).

ent case, because there were no contracts to surrender the Government's sovereign power to regulate.[35]

There is no question, conversely, that the Bank Board and FSLIC had ample statutory authority to do what the Court of Federal Claims and the Federal Circuit found they did do, that is, promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible. The organic statute creating FSLIC as an arm of the Bank Board, 12 U. S. C. § 1725(c) (1988 ed.) (repealed 1989), generally empowered it "[t]o make contracts,"[36] and § 1729(f)(2), enacted in 1978, delegated more specific powers in the context of supervisory mergers:

> "Whenever an insured institution is in default or, in the judgment of the Corporation, is in danger of default, the Corporation may, in order to facilitate a merger or consolidation of such insured institution with another insured institution . . . guarantee such other insured institution against loss by reason of its merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution in or in danger of default." 12 U. S. C. § 1729(f)(2) (1976 ed., Supp. V) (repealed 1989).

Nor is there any reason to suppose that the breadth of this authority was not meant to extend to contracts governing treatment of regulatory capital. Congress specifically rec-

---

[35] See Speidel, Implied Duties of Cooperation and the Defense of Sovereign Acts in Government Contracts, 51 Geo. L. J. 516, 542 (1963) ("[W]hile the contracting officers of Agency X cannot guarantee that the United States will not perform future acts of effective government, they can agree to compensate the contractor for damages resulting from justifiable acts of the United States in its 'sovereign capacity'" (footnotes omitted)).

[36] See also 1 R. Nash & J. Cibinic, Federal Procurement Law 5 (3d ed. 1977) ("The authority of the executive to use contracts in carrying out authorized programs is . . . generally assumed in the absence of express statutory prohibitions or limitations").

ognized FSLIC's authority to permit thrifts to count good-will toward capital requirements when it modified the National Housing Act in 1987:

> "No provision of this section shall affect the authority of the [FSLIC] to authorize insured institutions to utilize subordinated debt and goodwill in meeting reserve and other regulatory requirements." 12 U. S. C. § 1730h(d) (1988 ed.) (repealed 1989).

See also S. Rep. No. 100–19, p. 55 (1987) ("It is expected . . . that the [Bank Board] will retain its own authority to determine . . . the components and level of capital to be required of FSLIC-insured institutions"); *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974) ("[S]ubsequent legislation declaring the intent of an earlier statute is entitled to significant weight"). There is no serious question that FSLIC (and the Bank Board acting through it) was authorized to make the contracts in issue.

## IV

The Government's final line of defense is the sovereign acts doctrine, to the effect that " '[w]hatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.' " *Horowitz* v. *United States*, 267 U. S., at 461 (quoting *Jones* v. *United States*, 1 Ct. Cl. 383, 384 (1865)). Because FIRREA's alteration of the regulatory capital requirements was a "public and general act," the Government says, that act could not amount to a breach of the Government's contract with respondents.

The Government's position cannot prevail, however, for two independent reasons. The facts of this case do not warrant application of the doctrine, and even if that were otherwise the doctrine would not suffice to excuse liability under this governmental contract allocating risks of regulatory change in a highly regulated industry.

In *Horowitz*, the plaintiff sued to recover damages for breach of a contract to purchase silk from the Ordnance Department. The agreement included a promise by the Department to ship the silk within a certain time, although the manner of shipment does not appear to have been a subject of the contract. Shipment was delayed because the United States Railroad Administration placed an embargo on shipments of silk by freight, and by the time the silk reached Horowitz the price had fallen, rendering the deal unprofitable. This Court barred any damages award for the delay, noting that "[i]t has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." 267 U. S., at 461. This statement was not, however, meant to be read as broadly as the Government urges, and the key to its proper scope is found in that portion of our opinion explaining that the essential point was to put the Government in the same position that it would have enjoyed as a private contractor:

> " 'The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. . . . In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defend-

ants.'" *Ibid.* (quoting *Jones* v. *United States, supra,* at 384).

The early Court of Claims cases upon which *Horowitz* relied anticipated the Court's emphasis on the Government's dual and distinguishable capacities and on the need to treat the Government-as-contractor the same as a private party. In *Deming* v. *United States,* 1 Ct. Cl. 190 (1865), the Court of Claims rejected a suit by a supplier of army rations whose costs increased as a result of Congress's passage of the Legal Tender Act. The *Deming* court thought it "grave error" to suppose that "general enactments of Congress are to be construed as evasions of [the plaintiff's] particular contract." *Id.,* at 191. "The United States as a contractor are not responsible for the United States as a lawgiver," the court said. "In this court the United States can be held to no greater liability than other contractors in other courts." *Ibid.* Similarly, *Jones* v. *United States, supra,* refused a suit by surveyors employed by the Commissioner of Indian Affairs, whose performance had been hindered by the United States's withdrawal of troops from Indian country. "The United States as a contractor," the Claims Court concluded, "cannot be held liable directly or indirectly for the public acts of the United States as a sovereign." *Id.,* at 385.

The Government argues that "[t]he relevant question [under these cases] is whether the impact [of governmental action] . . . is caused by a law enacted to govern regulatory policy and to advance the general welfare." Brief for United States 45. This understanding assumes that the dual characters of Government as contractor and legislator are never "fused" (within the meaning of *Horowitz*) so long as the object of the statute is regulatory and meant to accomplish some public good. That is, on the Government's reading, a regulatory object is proof against treating the legislature as having acted to avoid the Government's contractual obligations, in which event the sovereign acts defense would

not be applicable. But the Government's position is open to serious objection.

As an initial matter, we have already expressed our doubt that a workable line can be drawn between the Government's "regulatory" and "nonregulatory" capacities. In the present case, the Government chose to regulate capital reserves to protect FSLIC's insurance fund, much as any insurer might impose restrictions on an insured as a condition of the policy. The regulation thus protected the Government in its capacity analogous to a private insurer, the same capacity in which it entered into supervisory merger agreements to convert some of its financial insurance obligations into responsibilities of private entrepreneurs. In this respect, the supervisory mergers bear some analogy to private contracts for reinsurance.[37] On the other hand, there is no question that thrift regulation is, in fact, regulation, and that both the supervisory mergers of the 1980's and the subsequent passage of FIRREA were meant to advance a broader public interest. The inescapable conclusion from all of this is that the Government's "regulatory" and "nonregulatory" capacities were fused in the instances under consideration, and we suspect that such fusion will be so common in the modern regulatory state as to leave a criterion of "regulation" without much use in defining the scope of the sovereign acts doctrine.[38]

---

[37] Nor is there any substance to the claim that these were contracts that only the Government could make. The regulatory capital or net worth requirements at issue applied only to thrifts choosing to carry federal deposit insurance, see Federal Home Loan Bank System, A Guide to the Federal Home Loan Bank System 69 (5th ed. 1987), and institutions choosing to self-insure or to seek private insurance elsewhere would have been free to make similar agreements with private insurers.

[38] Moreover, if the dissent were correct that the sovereign acts doctrine permits the Government to abrogate its contractual commitments in "regulatory" cases even where it simply sought to avoid contracts it had come to regret, then the Government's sovereign contracting power would be of very little use in this broad sphere of public activity. We rejected a

An even more serious objection is that allowing the Government to avoid contractual liability merely by passing any "regulatory statute" would flout the general principle that, "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch* v. *United States*, 292 U. S., at 579.[39] Careful attention to the cases shows that the sovereign acts doctrine was meant to serve this principle, not undermine it. In *Horowitz*, for example, if the defendant had been a private shipper, it would have been entitled to assert the common-law defense of impossibility of performance against Horowitz's claim for breach. Although that defense is traditionally unavailable where the barrier to performance arises from the act of the party seeking discharge, see Restatement (Second) of Contracts § 261; 2 E. Farnsworth, Contracts § 9.6, p. 551 (1990); cf. *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757, 767–768, n. 10 (1983), *Horowitz* held that the "public and general" acts of the sovereign are not

_____

virtually identical argument in *Perry* v. *United States*, 294 U. S. 330 (1935), in which Congress had passed a resolution regulating the payment of obligations in gold. We held that the law could not be applied to the Government's own obligations, noting that "the right to make binding obligations is a competence attaching to sovereignty." *Id.*, at 353.

[39] See also *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 369 (1943) ("'The United States does business on business terms'") (quoting *United States* v. *National Exchange Bank of Baltimore*, 270 U. S. 527, 534 (1926)); *Perry* v. *United States*, *supra*, at 352 (1935) ("When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments. There is no difference except that the United States cannot be sued without its consent" (citation omitted)); *United States* v. *Bostwick*, 94 U. S. 53, 66 (1877) ("The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf"); *Cooke* v. *United States*, 91 U. S. 389, 398 (1875) (explaining that when the United States "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there").

attributable to the Government as contractor so as to bar the Government's right to discharge. The sovereign acts doctrine thus balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor. If the answer is no, the Government's defense to liability depends on the answer to the further question, whether that act would otherwise release the Government from liability under ordinary principles of contract law.[40] Neither question can be answered in the Government's favor here.

## A

If the Government is to be treated like other contractors, some line has to be drawn in situations like the one before us between regulatory legislation that is relatively free of Government self-interest and therefore cognizable for the purpose of a legal impossibility defense and, on the other hand, statutes tainted by a governmental object of self-relief. Such an object is not necessarily inconsistent with a public purpose, of course, and when we speak of governmental "self-interest," we simply mean to identify instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties. Cf. *Armstrong* v. *United States*, 364 U. S., at 49 (The Government may not "forc[e] some people alone to bear public burdens

---

[40] See *Jones* v. *United States*, 1 Ct. Cl. 383, 385 (1865) ("Wherever the public and private acts of the government seem to commingle, a citizen or corporate body must by supposition be substituted in its place, and then the question be determined whether the action will lie against the supposed defendant"); *O'Neill* v. *United States*, 231 Ct. Cl. 823, 826 (1982) (sovereign acts doctrine applies where, "[w]ere [the] contracts exclusively between private parties, the party hurt by such governing action could not claim compensation from the other party for the governing action"). The dissent ignores these statements (including the statement from *Jones*, from which case *Horowitz* drew its reasoning literally verbatim), when it says, *post*, at 931, that the sovereign acts cases do not emphasize the need to treat the government-as-contractor the same as a private party.

which . . . should be borne by the public as a whole"). Hence, while the Government might legitimately conclude that a given contractual commitment was no longer in the public interest, a government seeking relief from such commitments through legislation would obviously not be in a position comparable to that of the private contractor who willy-nilly was barred by law from performance. There would be, then, good reason in such circumstance to find the regulatory and contractual characters of the Government fused together, in *Horowitz's* terms, so that the Government should not have the benefit of the defense.[41]

*Horowitz's* criterion of "public and general act" thus reflects the traditional "rule of law" assumption that generality in the terms by which the use of power is authorized will tend to guard against its misuse to burden or benefit the few unjustifiably.[42] See, *e. g., Hurtado* v. *California,* 110 U. S. 516, 535–536 (1884) ("Law . . . must be not a special rule for a particular person or a particular case, but . . . '[t]he general law . . .' so 'that every citizen shall hold his life, liberty, property and immunities under the protection of the general

---

[41] Our Contract Clause cases have demonstrated a similar concern with governmental self-interest by recognizing that "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co. of N. Y.* v. *New Jersey,* 431 U. S. 1, 26 (1977); see also *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.,* 459 U. S. 400, 412–413, and n. 14 (1983) (noting that a stricter level of scrutiny applies under the Contract Clause when a State alters its own contractual obligations); cf. *Perry, supra,* at 350–351 (drawing a "clear distinction" between Congress's power over private contracts and "the power of the Congress to alter or repudiate the substance of its own engagements").

[42] The generality requirement will almost always be met where, as in *Deming,* the governmental action "bears upon [the Government's contract] as it bears upon all similar contracts between citizens." *Deming* v. *United States,* 1 Ct. Cl. 190, 191 (1865). *Deming* is less helpful, however, in cases where, as here, the public contracts at issue have no obvious private analogs.

rules which govern society'" (citation omitted)).[43]   Hence,
governmental action will not be held against the Govern-
ment for purposes of the impossibility defense so long as the
action's impact upon public contracts is, as in *Horowitz*,
merely incidental to the accomplishment of a broader gov-
ernmental objective.   See *O'Neill* v. *United States*, 231 Ct.
Cl. 823, 826 (1982) (noting that the sovereign acts doctrine
recognizes that "the Government's actions, otherwise legal,
will occasionally incidentally impair the performance of con-
tracts").[44]   The greater the Government's self-interest, how-
ever, the more suspect becomes the claim that its private
contracting partners ought to bear the financial burden of
the Government's own improvidence, and where a substan-
tial part of the impact of the Government's action rendering
performance impossible falls on its own contractual obliga-
tions, the defense will be unavailable.   Cf. *Sun Oil Co.* v.
*United States*, 215 Ct. Cl. 716, 768, 572 F. 2d 786, 817 (1978)
(rejecting sovereign acts defense where the Secretary of the
Interior's actions were "'directed principally and primarily
at plaintiffs' contractual right'").[45]

---

[43] The dissent accuses us of transplanting this due process principle into
alien soil, see *post*, at 931–932.   But this Court did not even wait until the
Term following *Hurtado* before applying its principle of generality to a
case that, like this one, involved the deprivation of property rights.   See
*Hagar* v. *Reclamation Dist. No. 108*, 111 U. S. 701, 708 (1884).   More im-
portantly, it would be surprising indeed if the sovereign acts doctrine,
resting on the inherent nature of sovereignty, were not shaped by funda-
mental principles about how sovereigns ought to behave.

[44] See also Speidel, 51 Geo. L. J., at 539–540 (observing that "the com-
monly expressed conditions to the availability of the sovereign acts de-
fense" are not only that "the act . . . must have been 'public and general,'"
but also that "the damage to the contractor must have been caused indi-
rectly"); cf. *Exxon Corp.* v. *Eagerton*, 462 U. S. 176, 191–192 (1983) (distin-
guishing between direct and incidental impairments under the Contract
Clause).

[45] Cf. also *Resolution Trust Corporation* v. *Federal Savings and Loan
Insurance Corporation*, 25 F. 3d 1493, 1501 (CA10 1994) ("The limits of
this immunity [for sovereign acts] are defined by the extent to which the

The dissent would adopt a different rule that the Government's dual roles of contractor and sovereign may never be treated as fused, relying upon *Deming*'s pronouncement that " '[t]he United States as a contractor are not responsible for the United States as a lawgiver.' " *Post,* at 931 (quoting 1 Ct. Cl., at 191). But that view would simply eliminate the "public and general" requirement, which presupposes that the Government's capacities must be treated as fused when the Government acts in a nongeneral way. *Deming* itself twice refers to the "general" quality of the enactment at issue, 1 Ct. Cl., at 191, and notes that "[t]he statute bears upon [the governmental contract] as it bears upon all similar contracts between citizens, and affects it in no other way." *Ibid.* At the other extreme, of course, it is clear that any benefit at all to the Government will not disqualify an act as "public and general"; the silk embargo in *Horowitz,* for example, had the incidental effect of releasing the Government from its contractual obligation to transport Mr. Horowitz's shipment. Our holding that a governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations strikes a middle course between these two extremes.[46]

---

government's failure to perform is the result of legislation targeting a class of contracts to which it is a party"); *South Louisiana Grain Services, Inc.* v. *United States,* 1 Cl. Ct. 281, 287, n. 6 (1982) (rejecting sovereign acts defense where the Government agency's actions "were directed specifically at plaintiff's alleged contract performance"). Despite the dissent's predictions, the sun is not, in fact, likely to set on the sovereign acts doctrine. While an increase in regulation by contract will produce examples of the "fusion" that bars the defense, we may expect that other sovereign activity will continue to occasion the sovereign acts defense in cases of incidental effect.

[46] A different intermediate position would be possible, at least in theory. One might say that a governmental action was not "public and general" under *Horowitz* if its predominant purpose or effect was avoidance of the Government's contractual commitments. The difficulty, however, of ascertaining the relative intended or resulting impacts on governmental and

## B

In the present case, it is impossible to attribute the exculpatory "public and general" character to FIRREA. Although we have not been told the dollar value of the relief the Government would obtain if insulated from liability under contracts such as these, the attention given to the regulatory contracts prior to passage of FIRREA shows that a substantial effect on governmental contracts is certain. The statute not only had the purpose of eliminating the very accounting gimmicks that acquiring thrifts had been promised, but the specific object of abrogating enough of the acquisition contracts as to make that consequence of the legislation a focal point of the congressional debate.[47] Opponents of FIRREA's new capital requirements complained that "[i]n its present form, [FIRREA] would abrogate written agree-

---

purely private contracts persuades us that this test would prove very difficult to apply.

[47] We note that whether or not Congress intended to abrogate supervisory merger agreements providing that supervisory goodwill would count toward regulatory capital requirements has been the subject of extensive litigation in the Courts of Appeals, and that every Circuit to consider the issue has concluded that Congress did so intend. See *Transohio Sav. Bank* v. *Director, Office of Thrift Supervision,* 967 F. 2d 598, 617 (CADC 1992); *Carteret Sav. Bank* v. *Office of Thrift Supervision,* 963 F. 2d 567, 581–582 (CA3 1992); *Security Sav. & Loan* v. *Director, Office of Thrift Supervision,* 960 F. 2d 1318, 1322 (CA5 1992); *Far West Federal Bank* v. *Director, Office of Thrift Supervision,* 951 F. 2d 1093, 1098 (CA9 1991); *Guaranty Financial Services, Inc.* v. *Ryan,* 928 F. 2d 994, 1006 (CA11 1991); *Franklin Federal Sav. Bank* v. *Director, Office of Thrift Supervision,* 927 F. 2d 1332, 1341 (CA6), cert. denied, 502 U. S. 937 (1991); cf. *Resolution Trust Corporation, supra,* at 1502 (observing that "FIRREA's structure leaves little doubt that Congress well knew the crippling effects strengthened capital requirements would have on mergers that relied on supervisory goodwill," but concluding that Congress sought to mitigate the impact by giving OTS authority to exempt thrifts until 1991); *Charter Federal Sav. Bank* v. *Office of Thrift Supervision,* 976 F. 2d 203, 210 (CA4 1992) (accepting the conclusions of the other Circuits in dictum), cert. denied, 507 U. S. 1004 (1993).

ments made by the U. S. government to thrifts that acquired failing institutions by changing the rules in the middle of the game." 135 Cong. Rec. 12145 (1989) (statement of Rep. Ackerman). Several Congressmen observed that, "[s]imply put, [Congress] has reneged on the agreements that the government entered into concerning supervisory goodwill." House Report, at 498 (additional views of Reps. Annunzio, Kanjorski, and Flake).[48] A similar focus on the supervisory merger contracts is evident among proponents of the legislation; Representative Rostenkowski, for example, insisted that "the Federal Government should be able to change requirements when they have proven to be disastrous and con-

---

[48] See also House Report, at 534 (additional views of Reps. Hiler, Ridge, Bartlett, Dreier, McCandless, Saiki, Baker, and Paxon) ("For the institutions with substantial supervisory goodwill, the bill radically changes the terms of previously negotiated transactions"); id., at 507–508 (additional views of Rep. LaFalce) ("Those institutions which carry intangible assets on their books do so generally under written agreements they have entered into with the U. S. government, agreements which generally state that they cannot be superseded by subsequent regulations"); id., pt. 5, at 27 (additional views of Rep. Hyde) ("[Thrifts] were told that they would be able to carry this goodwill on their books as capital for substantial periods of time. . . . The courts could well construe these agreements as formal contracts. Now, . . . Congress is telling these same thrifts that they cannot count this goodwill toward meeting the new capital standards"); 135 Cong. Rec. 12063 (1989) (statement of Rep. Crane) (FIRREA "would require these S&Ls to write off this goodwill in a scant 5 years. This legislation violates the present agreements that these institutions made with the Federal Government"). Although there was less of a focus on the impact of FIRREA on supervisory goodwill in the Senate, at least two Senators noted that the new capital requirements would have the effect of abrogating government contracts. See id., at 9563 (statement of Sen. Hatfield) ("The new tangible capital standards in the legislation specifically exclude supervisory goodwill, and in doing so effectively abrogate agreements made between the Federal Home Loan Bank Board, on behalf of the U. S. Government, and certain healthy thrift institutions"); id., at 18874 (statement of Sen. D'Amato) (asking "whether any future transactions involving failed or failing institutions will be possible after this bill sanctions a wholesale reneging of Federal agency agreements").

trary to the public interest. The contracts between the savings and loan owners when they acquired failing institutions in the early 1980's are not contracts written in stone." 135 Cong. Rec., at 12077.[49]

This evidence of intense concern with contracts like the ones before us suffices to show that FIRREA had the substantial effect of releasing the Government from its own contractual obligations. Congress obviously expected FIRREA to have such an effect, and in the absence of any evidence to the contrary we accept its factual judgment that this would be so.[50] Nor is Congress's own judgment neutralized by the fact, emphasized by the Government, that FIRREA did not formally target particular transactions. Legislation can almost always be written in a formally gen-

---

[49] See also House Report, at 545 (Supplemental Views of Reps. Schumer, Morrison, Roukema, Gonzalez, Vento, McMillen, and Hoagland) ("[A]n overriding public policy would be jeopardized by the continued adherence to arrangements which were blithely entered into by the FSLIC"); 135 Cong. Rec., at 12062 (statement of Rep. Gonzalez) ("[I]n blunt terms, the Bank Board and FSLIC insurance fund managers entered into bad deals—I might even call them steals"); *id.*, at 11789 (statement of Rep. Saxton) ("In short[,] goodwill agreements were a mistake and as the saying goes . . . 'Two wrongs don't make a right' "). These proponents defeated two amendments to FIRREA, proposed by Reps. Quillen and Hyde, which would have given thrifts that had received capital forbearances from thrift regulators varying degrees of protection from the new rules. See *Transohio Sav. Bank* v. *Director, Office of Thrift Supervision, supra,* at 616–617; see also 135 Cong. Rec. 12068 (1989) (statement of Rep. Price) ("[T]he proponents of [the Hyde] amendment say a 'Deal is a Deal' . . . . But to claim that Congress can never change a regulator's decision . . . in the future is simply not tenable"); *Franklin Federal Sav. Bank* v. *Director, Office of Thrift Supervision, supra,* at 1340–1341 (reviewing the House debate and concluding that *"[n]obody* expressed the view that FIRREA did not abrogate forbearance agreements regarding supervisory goodwill" (emphasis in original)).

[50] Despite the claims of the dissent, our test does not turn upon "some sort of legislative intent," *post,* at 933. Rather, we view Congress's expectation that the Government's own obligations would be heavily affected simply as good evidence that this was, indeed, the case.

eral way, and the want of an identified target is not much security when a measure's impact nonetheless falls substantially upon the Government's contracting partners. For like reason, it does not answer the legislative record to insist, as the Government does, that the congressional focus is irrelevant because the broad purpose of FIRREA was to "advance the general welfare." Brief for United States 45. We assume nothing less of all congressional action, with the result that an intent to benefit the public can no more serve as a criterion of a "public and general" sovereign act than its regulatory character can.[51] While our limited enquiry into the background and evolution of the thrift crisis leaves us with the understanding that Congress acted to protect the public in the FIRREA legislation, the extent to which this reform relieved the Government of its own contractual obligations precludes a finding that the statute is a "public and general" act for purposes of the sovereign acts defense.[52]

_____

[51] We have, indeed, had to reject a variant of this argument before. See _Lynch_ v. _United States_, 292 U. S. 571, 580 (1934) (acknowledging a public need for governmental economy, but holding that "[t]o abrogate contracts, in the attempt to lessen governmental expenditure, would be not the practice of economy, but an act of repudiation"); see also Speidel, 51 Geo. L. J., at 522 (noting that even when "the Government's acts are motivated or required by public necessity . . . [t]he few decisions on point seem to reject public convenience or necessity as a defense, particularly where [the Government's action] directly alters the terms of the contract").

[52] The dissent contends that FIRREA must be a "public and general" act because it "occupies 372 pages in the Statutes at Large, and under 12 substantive titles contains more than 150 numbered sections." _Post_, at 934. But any act of repudiation can be buried in a larger piece of legislation, and if that is enough to save it then the Government's contracting power will not count for much. To the extent that THE CHIEF JUSTICE relies on the fact that FIRREA's core capital requirements applied to all thrift institutions, we note that neither he nor the Government has provided any indication of the relative incidence of the new statute in requiring capital increases for thrifts subject to regulatory agreements affecting capital and those not so subject.

## C

Even if FIRREA were to qualify as "public and general," however, other fundamental reasons would leave the sovereign acts doctrine inadequate to excuse the Government's breach of these contracts. As *Horowitz* makes clear, that defense simply relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible. But even if the Government stands in the place of a private party with respect to "public and general" sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach. As the Restatement puts it,

> "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261.

See also 2 Farnsworth on Contracts § 9.6, at 543–544 (listing four elements of the impossibility defense). Thus, since the object of the sovereign acts defense is to place the Government as contractor on par with a private contractor in the same circumstances, *Horowitz*, 267 U. S., at 461, the Government, like any other defending party in a contract action, must show that the passage of the statute rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed, and must ultimately show that the language or circumstances do not indicate that the Government should be liable in any case. While we do not say that these conditions can never be satisfied when the Government contracts with participants in a regulated industry for particular regulatory treatment, we find that

the Government as such a contractor has not satisfied the conditions for discharge in the present case.

1

For a successful impossibility defense the Government would have to show that the nonoccurrence of regulatory amendment was a basic assumption of these contracts. See, e. g., Restatement (Second) of Contracts § 261; 2 Farnsworth, supra, § 9.6, at 549–550. The premise of this requirement is that the parties will have bargained with respect to any risks that are both within their contemplation and central to the substance of the contract; as Justice Traynor said, "[i]f [the risk] was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." *Lloyd* v. *Murphy*, 25 Cal. 2d 48, 54, 153 P. 2d 47, 50 (1944).[53] That

---

[53] See also *Transatlantic Financing Corp.* v. *United States*, 363 F. 2d 312, 315 (CADC 1966) (requiring that the contingency rendering performance impossible be "'something' unexpected"); *Companhia de Navegacao Lloyd Brasiliero* v. *C. G. Blake Co.*, 34 F. 2d 616, 619 (CA2 1929) (L. Hand, J.) (asking "how unexpected at the time [the contract was made] was the event which prevented performance"); see also *Kel Kim Corp.* v. *Central Markets, Inc.*, 70 N. Y. 2d 900, 902, 524 N. E. 2d 295, 296 (1987) ("[T]he impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract"); *Barbarossa & Sons, Inc.* v. *Iten Chevrolet, Inc.*, 265 N. W. 2d 655, 659 (Minn. 1978) (asking "whether the risk of the given contingency was so unusual or unforeseen and would have such severe consequences that to require performance would be to grant the promisee an advantage for which he could not be said to have bargained in making the contract"); *Mishara Construction Co.* v. *Transit-Mixed Concrete Corp.*, 365 Mass. 122, 129, 310 N. E. 2d 363, 367 (1974) ("The question is . . . [w]as the contingency which developed one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance?"); *Krell* v. *Henry*, 2 K. B. 740, 752 (1903) ("The test seems to be whether the event which causes the impossibility was or might have been anticipated and guarded against"); 18 W. Jaeger, Williston on Contracts § 1931, p. 8 (3d ed. 1978) ("The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been

inference is particularly compelling, where, as here, the contract provides for particular regulatory treatment (and, *a fortiori*, allocates the risk of regulatory change). Such an agreement reflects the inescapable recognition that regulated industries in the modern world do not live under the law of the Medes and the Persians, and the very fact that such a contract is made at all is at odds with any assumption of regulatory stasis. In this particular case, whether or not the reach of the FIRREA reforms was anticipated by the parties, there is no doubt that some changes in the regulatory structure governing thrift capital reserves were both foreseeable and likely when these parties contracted with the Government, as even the Government agrees. It says in its brief to this Court that "in light of the frequency with which federal capital requirements had changed in the past . . . , it would have been unreasonable for Glendale, FSLIC, or the Bank Board to expect or rely upon the fact that those requirements would remain unchanged." Brief for United States 26; see also *id.*, at 3, n. 1 (listing the changes).[54] The Federal Circuit panel in this case likewise found that the regulatory capital requirements "have been the subject of

---

within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor"). Although foreseeability is generally a relevant, but not dispositive, factor, see 2 E. Farnsworth, Contracts § 9.6, at 555–556; *Opera Company of Boston, Inc.* v. *Wolf Trap Foundation for the Performing Arts*, 817 F. 2d 1094, 1101 (CA4 1987), there is no reason to look further where, as here, the risk was foreseen to be more than minimally likely, went to the central purpose of the contract, and could easily have been allocated in a different manner had the parties chosen to do so, see *id.*, at 1099–1102; 18 Williston on Contracts, *supra*, § 1953, at 119.

[54] The Government confirmed this point at oral argument. When asked whether FIRREA's tightening of the regulatory capital standards was "exactly the event that the parties assumed might happen when they made their contracts," the Government responded, "Exactly. Congress had changed capital standards many times over the years." Tr. of Oral Arg. 9.

numerous statutory and regulatory changes over the years," and "changed three times in 1982 alone." 994 F. 2d, at 801.[55] Given these fluctuations, and given the fact that a single modification of the applicable regulations could, and ultimately did, eliminate virtually all of the consideration provided by the Government in these transactions, it would be absurd to say that the nonoccurrence of a change in the regulatory capital rules was a basic assumption upon which these contracts were made. See, e. g., *Moncrief* v. *Williston Basin Interstate Pipeline Co.*, 880 F. Supp. 1495, 1508 (Wyo. 1995); *Vollmar* v. *CSX Transportation, Inc.*, 705 F. Supp. 1154, 1176 (ED Va. 1989), aff'd, 898 F. 2d 413 (CA4 1990).

2

Finally, any governmental contract that not only deals with regulatory change but allocates the risk of its occurrence will, by definition, fail the further condition of a successful impossibility defense, for it will indeed indicate that the parties' agreement was not meant to be rendered nugatory by a change in the regulatory law. See Restatement

---

[55] See, e. g., Garn-St Germain Depository Institutions Act of 1982, Pub. L. 97–320, 96 Stat. 1469 (eliminating any fixed limits to Bank Board discretion in setting reserve requirements); Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. 96–221, 94 Stat. 132, 160 (conferring discretionary authority on the Bank Board to set reserve requirements between 3 and 6 percent); 47 Fed. Reg. 3543 (lowering the reserve ratio from 4 to 3 percent); id., at 31859 (excluding certain "contra-asset" accounts from reserve calculations); id., at 52961 (permitting thrifts to count appraised equity capital toward reserves); see also *Charter Federal Sav. Bank* v. *Office of Thrift Supervision*, 976 F. 2d, at 212 (noting that because "[c]apital requirements have been an evolving part of the regulatory scheme since its inception," the Bank Board "would have expected changes in statutory requirements, including capital requirements"); *Carteret Sav. Bank* v. *Office of Thrift Supervision*, 963 F. 2d, at 581 (observing that "[i]n the massively regulated banking industry, . . . the rules of the game change with some regularity").

(Second) of Contracts § 261 (no impossibility defense where the "language or the circumstances" indicate allocation of the risk to the party seeking discharge).[56] The mere fact that the Government's contracting agencies (like the Bank Board and FSLIC) could not themselves preclude Congress from changing the regulatory rules does not, of course, stand in the way of concluding that those agencies assumed the risk of such change, for determining the consequences of legal change was the point of the agreements. It is, after all, not uncommon for a contracting party to assume the risk of an event he cannot control,[57] even when that party is an agent of the Government. As the Federal Circuit has recognized, "[Government] contracts routinely include provisions shifting financial responsibility to the Government for events which might occur in the future. That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third party acts, inclement weather

---

[56] See also *Hughes Communications Galaxy, Inc.* v. *United States,* 998 F. 2d, at 957–959 (rejecting sovereign acts defense where contract was interpreted as expressly allocating the risk of change in governmental policy); Posner & Rosenfield, 6 J. Legal Studies, at 98 (noting that, subject to certain constraints, "[t]he contracting parties' chosen allocation of risk" should always be honored as the most efficient one possible).

[57] See, *e. g., Chicago, M. & St. P. R. Co.* v. *Hoyt,* 149 U. S. 1, 14–15 (1893) ("There can be no question that a party may by an absolute contract bind himself or itself to perform things which subsequently become impossible, or to pay damages for the nonperformance"). This is no less true where the event that renders performance impossible is a change in the governing law. See, *e. g.,* 4 R. Anderson, Anderson on the Uniform Commercial Code § 2–615:34, p. 286 (3d ed. 1983) ("Often in regard to impossibility due to change of law . . . there would be no difficulty in a promisor's assuming the risk of the legal possibility of his promise"); 6 A. Corbin, Corbin on Contracts § 1346, p. 432 (1962) ("Just as in other cases of alleged impossibility, the risk of prevention by courts and administrative officers can be thrown upon a contractor by a provision in the contract itself or by reason of established custom and general understanding").

and other *force majeure.*" *Hughes Communications Galaxy, Inc.* v. *United States,* 998 F. 2d 953, 958–959 (CA Fed. 1993).[58]

As to each of the contracts before us, our agreement with the conclusions of the Court of Federal Claims and the Federal Circuit forecloses any defense of legal impossibility, for those courts found that the Bank Board resolutions, Forbearance Letters, and other documents setting forth the accounting treatment to be accorded supervisory goodwill generated by the transactions were not mere statements of then-current regulatory policy, but in each instance were terms in an allocation of risk of regulatory change that was essential to the contract between the parties. See *supra,* at 861–864. Given that the parties went to considerable lengths in procuring necessary documents and drafting broad integration clauses to incorporate their terms into the contract itself, the Government's suggestion that the parties meant to say only that the regulatory treatment laid out in these documents

---

[58] See generally *Hills Materials Co.* v. *Rice,* 982 F. 2d 514, 516, n. 2 (CA Fed. 1992) ("[T]he [sovereign acts] doctrine certainly does not prevent the government as contractor from affirmatively assuming responsibility for specific sovereign acts"); *D & L Construction Co.* v. *United States,* 185 Ct. Cl. 736, 752, 402 F. 2d 990, 999 (1968) ("It has long been established that while the United States cannot be held liable directly or indirectly for public acts which it performs as a sovereign, the Government can agree in a contract that if it does exercise a sovereign power, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act, and that this agreement can be implied as well as expressed"); *Amino Brothers Co.* v. *United States,* 178 Ct. Cl. 515, 525, 372 F. 2d 485, 491 (same), cert. denied, 389 U. S. 846 (1967); *Gerhardt F. Meyne Co.* v. *United States,* 110 Ct. Cl. 527, 550, 76 F. Supp. 811, 815 (1948) (same). A common example of such an agreement is mandated by Federal Acquisition Regulation 52.222–43, which requires Government entities entering into certain fixed price service contracts to include a price adjustment clause shifting to the Government responsibility for cost increases resulting from compliance with Department of Labor wage and fringe benefit determinations. 48 CFR § 52.222–43 (1995).

would apply as an initial matter, subject to later change at the Government's election, is unconvincing. See *ibid.* It would, indeed, have been madness for respondents to have engaged in these transactions with no more protection than the Government's reading would have given them, for the very existence of their institutions would then have been in jeopardy from the moment their agreements were signed.

\* \* \*

We affirm the Federal Circuit's ruling that the United States is liable to respondents for breach of contract. Because the Court of Federal Claims has not yet determined the appropriate measure or amount of damages in this case, we remand for further proceedings.

*It is so ordered.*

JUSTICE BREYER, concurring.

I join the principal opinion because, in my view, that opinion is basically consistent with the following understanding of what the dissent and the Government call the "unmistakability doctrine." The doctrine appears in the language of earlier cases, where the Court states that

> "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and *will remain intact unless surrendered in unmistakable terms.*" *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 148 (1982) (emphasis added).

See also *United States* v. *Cherokee Nation of Okla.*, 480 U. S. 700, 706–707 (1987); *Bowen* v. *Public Agencies Opposed to Social Security Entrapment*, 477 U. S. 41, 52–53 (1986). The Government and the dissent believe that this language normally shields the Government from contract liability where a change in the law prevents it from carrying out its side of the bargain. In my view, however, this language,

while perhaps appropriate in the circumstances of the cases in which it appears, was not intended to displace the rules of contract interpretation applicable to the Government as well as private contractors in numerous ordinary cases, and in certain unusual cases, such as this one. Primarily for reasons explained in the principal opinion, this doctrine does not shield the Government from liability here.

Both common sense and precedent make clear that an "unmistakable" promise to bear the risk of a change in the law is not required in every circumstance in which a private party seeks contract damages from the Government. Imagine, for example, that the General Services Administration or the Department of Defense were to enter into a garden variety contract to sell a surplus commodity such as oil, under circumstances where (1) the time of shipment is critically important, (2) the parties are aware that pending environmental legislation could prevent the shipment, and (3) the fair inference from the circumstances is that if the environmental legislation occurs and prevents shipment, a private seller would incur liability for failure to ship on time.

Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstance. See *The Binghamton Bridge*, 3 Wall. 51, 74 (1866) ("All contracts are to be construed to accomplish the intention of the parties"); Restatement (Second) of Contracts § 202(1) (1979) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight"). If the language and circumstances showed that the parties intended the seller to bear the risk of a performance-defeating change in the law, the seller would have to pay damages. See *id.*, § 261 (no liability where "a party's performance is made impracticable without his fault by the occurrence of an event [*i. e.*, the new environmental regulation] the non-occurrence of which was a basic assumption on which the contract was made . . . *unless the*

*language or the circumstances indicate the contrary*" (emphasis added)).

The Court has often said, as a general matter, that the "rights and duties" contained in a Government contract "are governed generally by the law applicable to contracts between private individuals." *Lynch* v. *United States,* 292 U. S. 571, 579 (1934); see *Perry* v. *United States,* 294 U. S. 330, 352 (1935) (same); *Sinking Fund Cases,* 99 U. S. 700, 719 (1879) ("The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen"); *United States* v. *Klein,* 13 Wall. 128, 144 (1872) (same); *United States* v. *Gibbons,* 109 U. S. 200, 203–204 (1883) (where contract language "susceptible of two meanings," Government's broader obligation was "sufficiently plain" from "the circumstances attending the transaction"); see also, *e. g., Russell* v. *Sebastian,* 233 U. S. 195, 205 (1914) (public grants to be given a "fair and reasonable" interpretation that gives effect to what it "satisfactorily appears" the government intended to convey).

The Court has also indicated that similar principles apply in certain cases where courts have had to determine whether or not a government seller is liable involving contracts resembling the ones before us. In *Lynch, supra,* for example, the Court held that the Federal Government must compensate holders of "war risk insurance" contracts, the promises of which it had abrogated through postcontract legislation. In the "gold clause" case, *Perry, supra,* the Court held that subsequent legislation could not abrogate a Government bond's promises to pay principal and interest in gold. In neither case did the Court suggest that an "unmistakable" promise, beyond that discernible using ordinary principles of contract interpretation, was necessary before liability could be imposed on the Government.

This approach is unsurprising, for in practical terms it ensures that the government is able to obtain needed goods and services from parties who might otherwise, quite rightly, be unwilling to undertake the risk of government contracting. See, *e. g., Detroit* v. *Detroit Citizens' Street R. Co.*, 184 U. S. 368, 384 (1902) (rejecting as "hardly . . . credible" the city's suggestion that the fare rate agreed on with railroad company, which "amounted to a contract," would be "subject to change from time to time" at the city's pleasure); *Murray* v. *Charleston*, 96 U. S. 432, 445 (1878) (A government contract "should be regarded as an assurance that [a sovereign right to withhold payment] will not be exercised. A promise to pay, with a reserved right to deny or change the effect of the promise, is an absurdity"); *New Jersey* v. *Yard*, 95 U. S. 104, 116–117 (1877) (same). This is not to say that the government is always treated just like a private party. The simple fact that it is the government may well change the underlying circumstances, leading to a different inference as to the parties' likely intent—say, making it far less likely that they *intend* to make a promise that will oblige the government to hold private parties harmless in the event of a change in the law. But to say this is to apply, not to disregard, the ordinary rule of contract law.

This approach is also consistent with congressional intent, as revealed in Congress' determination to permit, under the Tucker Act, awards of damages and other relief against the United States for "any claim . . . founded . . . upon any express or implied contract." 28 U. S. C. § 1491(a)(1). The thrifts invoked this provision in their complaints as the basis for jurisdiction to adjudicate their claims in the lower courts, see App. 8 (Winstar), 137 (Statesman), and 546 (Glendale); and, as the principal opinion explains, *ante*, at 858–859, the lower courts held that each proved the existence of an express promise by the Government to grant them particular regulatory treatment for a period of years. For my purposes, the provision is relevant only to show that Congress

clearly contemplated the award of damages for breach against the Government in some contexts where the Government's promises are far from "unmistakable" as the Government defines that term. While in this case, the lower courts found the promises to be "express," this Court has in other cases interpreted § 1491(a)(1) to permit claims for relief based on an "implied in fact" promise, which can be a promise "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R. Co.* v. *United States*, 261 U. S. 592, 597 (1923); see *Hercules, Inc.* v. *United States*, 516 U. S. 417, 424 (1996). These interpretations, as well as the statutory language, lend further support to the view that ordinary government contracts are typically governed by the rules applicable to contracts between private parties.

There are, moreover, at least two good reasons to think that the cases containing special language of "unmistakability" do not, as the Government suggests, impose an additional "clear-statement" rule, see Brief for United States 19, that shields the Government from liability here. First, it is not clear that the "unmistakability" language was determinative of the outcome in those cases. In two of the three cases in which that language appears (and several of the older cases from which it is derived), the private parties claimed that the sovereign had effectively promised not to change the law in an area of law *not mentioned* in the contract at issue. In *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S., at 148, for example, the contracts were leases by a sovereign Indian Tribe to private parties of rights to extract oil and gas from tribal lands. The private party claimed that the leases contained an implicit waiver of the power to impose a severance tax on the oil and gas. The Court pointed out that the leases said nothing about taxes, thereby requiring an inference of intent from "silence." *Ibid.* Though the

opinion contains language of "unmistakability," the Court was not called upon in *Merrion* to decide whether a sovereign's promise not to change the law (or to pay damages if it did) was clear enough to justify liability, because there was no evidence of *any* such promise in the "contracts" in that case. Yet, that is the effect the Government asks us to give the "unmistakability" language in *Merrion* here.

The Court in *Merrion* cited *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 (1934), and *St. Louis* v. *United Railways Co.*, 210 U. S. 266 (1908), which in turn referred to a line of cases in which the Court held that a government's grant of a bank charter did not carry with it a promise not to tax the bank unless expressed "in terms too plain to be mistaken." *Jefferson Branch Bank* v. *Skelly*, 1 Black 436, 446 (1862). These cases illustrate the same point made above: Where a state-granted charter, or franchise agreement, did not implicate a promise not to tax, the Court held that no such promise was made. See *Providence Bank* v. *Billings*, 4 Pet. 514, 560, 561 (1830) (promise not to tax "ought not to be presumed" where "deliberate purpose of the state to abandon" power to tax "does not appear"); *St. Louis*, *supra*, at 274 (right to tax "still exists unless there is a distinct agreement, clearly expressed, that the sums to be paid are in lieu of all such exactions"). But, where the sovereign had made an express promise not to tax, the Court gave that promise its intended effect. See *Jefferson*, *supra*, at 450; *Piqua Branch of State Bank of Ohio* v. *Knoop*, 16 How. 369, 378 (1854) (same); *New Jersey* v. *Yard*, *supra*, at 115–117 (same).

Similarly, in the second "unmistakability" case, *United States* v. *Cherokee Nation of Okla.*, 480 U. S., at 706–707, a Government treaty granted the Tribe title to a riverbed, but it said nothing about the Government's pre-existing right to navigate the river. The Court held that it was most unlikely that a treaty silent on the matter would have conveyed the Government's navigational rights to the Tribe, particularly

since "[t]he parties . . . clearly understood that the [Government's] navigational" rights were "dominant no matter how the question of riverbed ownership was resolved." *Id.*, at 706.

The remaining case, *Bowen* v. *Public Agencies Opposed to Social Security Entrapment*, 477 U. S. 41 (1986), concerned an alleged promise closely related to the subject matter of the contract. A State and several state agencies claimed that Congress, in enacting a statute that gave States flexibility to include or withdraw certain employees from a federal social security program, promised *not to change* that "withdrawal" flexibility. But in *Bowen*, the statute itself expressly reserved to Congress the right to "alter, amend, or repeal" any of the statute's provisions. See *id.*, at 55. Hence, it is not surprising to find language in *Bowen* to the effect that other circumstances would have to be "unmistakable" before the Court could find a congressional promise to the contrary.

A second reason to doubt the Government's interpretation of the "unmistakability" language is that, in all these cases, the language was directed at the claim that the sovereign had made a broad promise not to legislate, or otherwise to exercise its sovereign powers. Even in the cases in which damages were sought *(e. g., Bowen, Cherokee Nation)*, the Court treated the claimed promise as a promise not to change the law, rather than as the kind of promise more normally at issue in contract cases, including this one—namely, a promise that obliges the government to hold a party harmless from a change in the law that the government remains free to make. See, *e. g., Bowen, supra*, at 52 (lower court decision "effectively . . . forbid[s] Congress to amend a provision of the Social Security Act"); *Cherokee Nation, supra*, at 707 (refusing to conclude that the Tribe "gained an exemption from the [Government's navigational] servitude simply because it received title to the riverbed interests"). It is difficult to believe that the Court intended its "unmistaka-

bility" language in these unusual cases to disable future courts from inferring, from language and circumstance under ordinary contract principles, a more narrow promise in more typical cases—say, a promise not to abrogate, or to restrict severely through legislation and without compensation, the very right that a sovereign explicitly granted by contract (*e. g.*, the right to drill for oil, or to use the riverbed).

The Government attempts to answer this objection to its reading of the "unmistakability" language by arguing that *any* award of "substantial damages" against the government for breach of contract through a change in the law "unquestionably carries the danger that needed future regulatory action will be deterred," and thus amounts to an infringement on sovereignty requiring an "unmistakable" promise. Brief for Petitioner 21. But this rationale has no logical stopping point. See, *e. g.*, *United States Trust Co. of N. Y. v. New Jersey*, 431 U. S. 1, 24 (1977) ("Any financial obligation could be regarded in theory as a relinquishment of the State's spending power, since money spent to repay debts is not available for other purposes. . . . Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts"). It is difficult to see how the Court could, in a principled fashion, apply the Government's rule in this case without also making it applicable to the ordinary contract case (like the hypothetical sale of oil) which, for the reasons explained above, are properly governed by ordinary principles of contract law. To draw the line—*i. e.*, to apply a more stringent rule of contract interpretation—based only on the amount of money at stake, and therefore (in the Government's terms) the degree to which future exercises of sovereign authority may be deterred, seems unsatisfactory. As the Government acknowledges, see Brief for United States 41, n. 34, this Court has previously rejected the argument that Congress has "the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money." *Bowen, supra*, at

918

55 (citing *Perry*, 294 U. S., at 350–351, and *Lynch*, 292 U. S., at 576–577).

In sum, these two factors, along with the general principle that the government is ordinarily treated like a private party when it enters into contracts, means that the "unmistakability" language might simply have underscored the special circumstances that would have been required to convince the Court of the existence of the claimed promise in the cases before it. At most, the language might have grown out of unique features of sovereignty, believed present in those cases, which, for reasons of policy, might have made appropriate a special caution in implying the claimed promise. But, I do not believe that language was meant to establish an "unmistakability" rule that controls more ordinary contracts, or that controls the outcome here.

The Government attempts to show that such special circumstances, warranting application of an unmistakability principle, are present in this case. To be sure, it might seem unlikely, in the abstract, that the Government would have intended to make a binding promise that would oblige it to hold the thrifts harmless from the effects of future regulation (or legislation) in such a high-risk, highly regulated context as the accounting practices of failing savings and loans. But, as the principal opinion's careful examination of the circumstances reveals, that is exactly what the Government did. The thrifts demonstrate that specific promises were made to accord them particular regulatory treatment for a period of years, which, when abrogated by subsequent legislation, rendered the Government liable for breach of contract. These promises affect only those thrifts with preexisting contracts of a certain kind. They are promises that the banks seek to infer from the explicit language of the contracts, not ones they read into contracts silent on the matter. And, there is *no special policy reason* related to sovereignty which would justify applying an "unmistakability" principle here. For these reasons, I join the principal opinion.

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in the judgment.

I agree with the principal opinion that the contracts at issue in this case gave rise to an obligation on the part of the Government to afford respondents favorable accounting treatment, and that the contracts were broken by the Government's discontinuation of that favorable treatment, as required by FIRREA, 12 U. S. C. § 1464(t). My reasons for rejecting the Government's defenses to this contract action are, however, quite different from the principal opinion's, so I must write separately to state briefly the basis for my vote.

The principal opinion dispenses with three of the four "sovereign" defenses raised by the Government simply by characterizing the contracts at issue as "risk-shifting agreements" that amount to nothing more than "promises by the Government to insure [respondents] against any losses arising from future regulatory change." *Ante*, at 881. Thus understood, the principal opinion explains, the contracts purport, not to constrain the exercise of sovereign power, but only to make the exercise of that power an event resulting in liability for the Government—with the consequence that the peculiarly sovereign defenses raised by the Government are simply inapplicable. This approach has several difficulties, the first being that it has no basis in our cases, which have not made the availability of these sovereign defenses (as opposed to their validity on the merits) depend upon the nature of the contract at issue. But in any event, it is questionable whether, even as a matter of normal contract law, the exercise in contract characterization in which the principal opinion engages is really valid. Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,— and nothing else." Holmes, The Path of the Law (1897), in 3 The Collected Works of Justice Holmes 391, 394 (S. Novick

ed. 1995). See *Horwitz-Matthews, Inc.* v. *Chicago*, 78 F. 3d 1248, 1250–1251 (CA7 1996).

In this case, it was an unquestionably sovereign act of government—enactment and implementation of provisions of FIRREA regarding treatment of regulatory capital—that gave rise to respondents' claims of breach of contract. Those claims were premised on the assertion that, in the course of entering into various agreements with respondents, the Government had undertaken to continue certain regulatory policies with respect to respondents' recently acquired thrifts; and the Government countered that assertion, in classic fashion, with the primary defense that contractual restrictions on sovereign authority will be recognized only where unmistakably expressed. The "unmistakability" doctrine has been applied to precisely this sort of situation—where a sovereign act is claimed to deprive a party of the benefits of a prior bargain with the government. See, *e. g.*, *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 135–136, 145–148 (1982).

Like THE CHIEF JUSTICE, see *post*, at 924–931, I believe that the unmistakability doctrine applies here, but unlike him I do not think it forecloses respondents' claims. In my view, the doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation. It is simply a rule of presumed (or implied-in-fact) intent. Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions. That is a reasonable estimation of what the parties intend. When I promise to do $x$ in exchange for your doing $y$, I impliedly promise not to do anything that will disable me from doing $x$, or disable you from doing $y$—so that if either of our performances is rendered impossible by such an act on my part, I am not excused from my obligation. When the contracting party is the government, however, it is simply *not* reasonable to presume an intent of that sort. To the con-

trary, it is reasonable to presume *(unless the opposite clearly appears)* that the sovereign does *not* promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts. The requirement of unmistakability embodies this reversal of the normal reasonable presumption. Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a commonsense way against that background understanding.

Here, however, respondents contend that they have overcome this reverse presumption that the Government remains free to make its own performance impossible through its manner of regulation. Their claim is that the Government quite plainly *promised* to regulate them in a particular fashion, into the future. They say that the very *subject matter* of these agreements, an essential part of the *quid pro quo,* was Government regulation; unless the Government is bound *as to that regulation,* an aspect of the transactions that reasonably must be viewed as a *sine qua non* of their assent becomes illusory. I think they are correct. If, as the dissent believes, the Government committed only "to provide [certain] treatment unless and until there is subsequent action," *post,* at 935, then the Government in effect said "we promise to regulate in this fashion for as long as we choose to regulate in this fashion"—which is an absolutely classic description of an illusory promise. See 1 R. Lord, Williston on Contracts § 1:2, p. 11 (4th ed. 1990). In these circumstances, it is unmistakably clear that the promise to accord favorable regulatory treatment must be understood as (unsurprisingly) a *promise* to accord favorable regulatory treatment. I do not accept that unmistakability demands that there be a *further* promise not to go back on the promise to accord favorable regulatory treatment.

The dissent says that if the Government agreed to accord the favorable regulatory treatment "in the short term, but

made no commitment about . . . the long term, respondents still received consideration." *Post*, at 935. That is true enough, but it is quite impossible to construe these contracts as providing for only "short term" favorable treatment, with the long term up for grabs: Either there was an undertaking to regulate respondents as agreed for the specified amortization periods, or there was no promise regarding the future at all—not even so much as a peppercorn's worth.

In sum, the special role of the agencies, and the terms and circumstances of the transactions, provide an adequate basis for saying that the promises that the trial court and the Court of Appeals for the Federal Circuit found to have been made in these cases were unmistakable ones. To be sure, those courts were not looking for "unmistakable" promises, see *post*, at 936, but unmistakability is an issue of law that we can determine here. It was found below that the Government had plainly made promises *to regulate* in a certain fashion, into the future; I agree with those findings, and I would conclude, for the reasons set forth above, that the promises were unmistakable. Indeed, it is hard to imagine what additional assurance that the course of regulation would not change could have been demanded—other than, perhaps, the Government's promise to keep its promise. That is not what the doctrine of unmistakability requires. While it is true enough, as the dissent points out, that one who deals with the Government may need to "'turn square corners,'" *post*, at 937 (quoting *Rock Island, A. & L. R. Co.* v. *United States*, 254 U. S. 141, 143 (1920)), he need not turn them twice.

The Government's remaining arguments are, I think, readily rejected. The scope and force of the "reserved powers" and "express delegation" defenses—which the principal opinion thinks inapplicable based on its view of the nature of the contracts at issue here, see *ante*, at 888–890—have not been well defined by our prior cases. The notion of "reserved powers" seems to stand principally for the proposi-

tion that certain core governmental powers cannot be surrendered, see, *e. g., Stone* v. *Mississippi,* 101 U. S. 814 (1880); thus understood, that doctrine would have no force where, as here, the private party to the contract does not seek to stay the exercise of sovereign authority, but merely requests damages for breach of contract. To the extent this Court has suggested that the notion of "reserved powers" contemplates, under some circumstances, nullification of even monetary governmental obligations pursuant to exercise of "the federal police power or some other paramount power," *Lynch* v. *United States,* 292 U. S. 571, 579 (1934), I do not believe that regulatory measures designed to minimize what are essentially assumed commercial risks are the sort of "police power" or "paramount power" referred to. And whatever is required by the "express delegation" doctrine is to my mind satisfied by the statutes which the principal opinion identifies as conferring upon the various federal bank regulatory agencies involved in this case authority to enter into agreements of the sort at issue here, see *ante,* at 890–891.

Finally, in my view the Government cannot escape its obligations by appeal to the so-called "sovereign acts" doctrine. That doctrine was first articulated in Court of Claims cases, and has apparently been applied by this Court in only a single case, our 3-page opinion in *Horowitz* v. *United States,* 267 U. S. 458, decided in 1925 and cited only once since, in a passing reference, see *Nortz* v. *United States,* 294 U. S. 317, 327 (1935). *Horowitz* holds that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of [a] particular contract resulting from its public and general acts as a sovereign." 267 U. S., at 461. In my view the "sovereign acts" doctrine adds little, if anything at all, to the "unmistakability" doctrine, and is avoided whenever that one would be—*i. e.,* whenever it is clear from the contract in question that the Government was committing itself not to rely upon its sovereign acts in asserting (or defending against) the doctrine of impossibility,

which is another way of saying that the Government had assumed the risk of a change in its laws. That this is the correct interpretation of *Horowitz* is made clear, I think, by our two principal cases of this century holding that the Government may not simply repudiate its contractual obligations, *Lynch* v. *United States, supra,* and *Perry* v. *United States,* 294 U. S. 330 (1935). Those cases, which are barely discussed in the principal opinion, failed even to mention *Horowitz.* In both of them, as here, Congress specifically set out to abrogate the *essential bargain* of the contracts at issue—and in both we declared such abrogation to amount to impermissible repudiation. See *Lynch, supra,* at 578–580; *Perry, supra,* at 350–354.

For the foregoing reasons, I concur in the judgment.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE GINSBURG joins as to Parts I, III, and IV, dissenting.

The principal opinion works sweeping changes in two related areas of the law dealing with government contracts. It drastically reduces the scope of the unmistakability doctrine, shrouding the residue with clouds of uncertainty, and it limits the sovereign acts doctrine so that it will have virtually no future application. I respectfully dissent.

## I

The principal opinion properly recognizes that the unmistakability doctrine is a "special rule" of government contracting which provides, in essence, a "canon of contract construction that surrenders of sovereign authority must appear in unmistakable terms." *Ante,* at 860. Exercises of the sovereign authority include of course the power to tax and, relevant to this case, the authority to regulate.

The most recent opinion of this Court dealing with the unmistakability doctrine is *United States* v. *Cherokee Nation of Okla.,* 480 U. S. 700 (1987). That case quoted language from *Bowen* v. *Public Agencies Opposed to Social Security*

*Entrapment*, 477 U. S. 41 (1986), which relied on *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 148 (1982), and *Merrion*, in turn, quoted the much earlier case of *St. Louis* v. *United Railways Co.*, 210 U. S. 266 (1908). *St. Louis* involved an agreement by the city to grant street railway companies use and occupancy of the streets, in exchange for specified consideration which included an annual license fee of $25 for each car used. *Id.*, at 272. When the city later passed an ordinance amending the license tax and imposing an additional tax based on the number of passengers riding each car, the railway companies challenged that amendment as a violation of the Contracts Clause. The Court there said that such a governmental power to tax resides in the city "unless this right has been specifically surrendered in terms which admit of no other reasonable interpretation." *Id.*, at 280.

*Merrion, supra*, was similar, but involved the sovereignty of an Indian Tribe. The Tribe had allowed oil companies to extract oil and natural gas deposits on the reservation land in exchange for the usual cash bonus, royalties, and rents to the Tribe. The Court found that, in so contracting, the Tribe had not surrendered its power to impose subsequently a severance tax on that production. *Merrion* explains that "[w]ithout regard to its source[—be it federal, state, local government, or Indian—]sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." 455 U. S., at 148.

Next, *Bowen, supra*, addressed Congress' repeal of a law that had once allowed States which contracted to bring their employees into the Federal Social Security System, to terminate that agreement and their participation upon due notice. *Bowen*, therefore, considered not the imposition of a tax as *St. Louis* and *Merrion*, but an amendment to a statutory provision that existed as a background rule when and under

which the contracts were formed—much like this case. The *Bowen* Court repeated the quoted language from *Merrion,* and reminded that "contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign." *Bowen, supra,* at 52 (quoting *Merrion, supra,* at 147).

Finally, we have *Cherokee Nation, supra,* in which the Court applied the unmistakability doctrine to a treaty, rather than a typical contract. Under the treaty the United States had granted to an Indian Tribe fee simple title to a riverbed. The Tribe claimed that the United States had not reserved its navigational servitude and hence that the Government's construction of a navigational channel that destroyed the riverbed's mineral interests was a taking under the Fifth Amendment without just compensation. The Court ruled that the treaty had not provided the Tribe an exemption from the navigational servitude, quoting from *Bowen* and *Merrion* the statement that "[s]uch a waiver of sovereign authority will not be implied, but instead must be '"surrendered in unmistakable terms."'" *Id.,* at 707.

These cases have stood until now for the well-understood proposition just quoted above—a waiver of sovereign authority will not be implied, but instead must be surrendered in unmistakable terms. Today, however, the principal opinion drastically limits the circumstances under which the doctrine will apply by drawing a distinction never before seen in our case law. The principal opinion tells us the unmistakability doctrine will apply where a plaintiff either seeks injunctive relief to hold the Government to its alleged surrender of sovereign authority (which generally means granting the plaintiff an exemption to the changed law), or seeks a damages award which would be "the equivalent of" such an injunction or exemption. *Ante,* at 879–880. But the doctrine will not apply where a plaintiff seeks an award for damages caused by the exercise of that sovereign authority. We are told that if the alleged agreement is not one to bind the Government to

refrain from exercising regulatory authority, but is one to shift the risk of a change in regulatory rules, the unmistakability doctrine does not apply. And, perhaps more remarkable, the principal opinion tells us that the Government will virtually always have assumed this risk in the regulatory context, by operation of law. *Ante,* at 869–870, 905–906.

The first problem with the principal opinion's formulation is a practical one. How do we know whether "the award of damages" will be "the equivalent of [an] exemption," *ante,* at 879–880, before we assess the damages? In this case, for example, "there has been no demonstration that awarding damages for breach would be tantamount" to an exemption to the regulatory change, *ante,* at 881; and there has been no demonstration to the contrary either. Thus we do not know in this very case whether the award of damages would "amount to" an injunction, *ante,* at 882. If it did, under the principal opinion's theory, the unmistakability doctrine *would apply,* and that application may preclude respondents' claim.

But even if we could solve that problem by determining the damages before liability, and by finding the award to be some amount other than the cost of an exemption, we would still be left with a wholly unsatisfactory distinction. Few, if any, of the plaintiffs in the unmistakability-doctrine cases would have insisted on an injunction, exemption, or their damages equivalent if they had known they could have avoided the doctrine by claiming the Government had agreed to assume the risk, and asking for an award of damages for breaching that implied agreement. It is impossible to know the monetary difference between such awards and, as the principal opinion suggests, the award for a breach of the risk-shifting agreement may even be more generous.

The principal opinion's newly minted distinction is not only untenable, but is contrary to our decisions in *Cherokee Nation* and *Bowen.* The Cherokee Nation sought damages and compensation for harm resulting from the Government's navigational servitude. *Cherokee Nation,* 480 U. S., at 701.

Indeed, one of the Tribe's arguments, upheld by the Court of Appeals, was that the United States could exercise its navigational servitude under the treaty, but that the Tribe had a right to compensation for any diminution in the value of its riverbed property.

Likewise, some of the plaintiffs in *Bowen* sought damages. They sought just compensation for the revocation of their alleged contractual right to terminate the employees' participation in the Social Security Program. The District Court in the decision which we reviewed in fact commented, as this Court reported, that it found that the " 'only rational compensation would be reimbursement by the United States to the State or public agencies, of the amount of money they currently pay to the United States for their participation.' " *Bowen*, 477 U. S., at 51 (quoting *Public Agencies Opposed to Social Security Entrapment* v. *Heckler*, 613 F. Supp. 558, 575 (ED Cal. 1985)). It was only because the District Court concluded that awarding this "measure of damages" was contradictory to the will of Congress that the court refrained from making such an award and instead simply declared the statutory amendment unconstitutional. 477 U. S., at 51. Neither *Cherokee Nation* nor *Bowen* hinted that the unmistakability doctrines applied in their case because the damages remedy sought "amount[ed] to" an injunction. *Ante,* at 882.

In *St. Louis* v. *United Railways Co.,* 210 U. S. 266 (1908), the plaintiff railway companies did seek to enjoin the enforcement of the tax by the city, and perhaps that case fits neatly within the principal opinion's scaled-down version of the unmistakability doctrine. But sophisticated lawyers in the future, litigating a claim exactly like the one in *St. Louis,* need only claim that the sovereign implicitly agreed not to change their tax treatment, and request damages for breach of that agreement. There will presumably be no unmistakability doctrine to contend with, and they will be in the same position as if they had successfully enjoined the tax. Such

a result has an Alice in Wonderland aspect to it, which suggests the distinction upon which it is based is a fallacious one.

The principal opinion justifies its novel departure from existing law by noting that the contracts involved in the present case—unlike those in *Merrion, Bowen,* and *Cherokee Nation*—"do not purport to bind the Congress from enacting regulatory measures." *Ante,* at 881. But that is precisely what the unmistakability doctrine, as a canon of construction, is designed to determine: *Did* the contract surrender the authority to enact or amend regulatory measures as to the contracting party? If the sovereign did surrender its power unequivocally, and the sovereign breached that agreement to surrender, then and only then would the issue of remedy for that breach arise.

The second reason the principal opinion advances for its limitation on the unmistakability doctrine is that if it were applied to all actions for damages, it would impair the Government's ability to enter into contracts. But the law is well established that Congress may not simply abrogate a statutory provision obligating performance without breaching the contract and rendering itself liable for damages. See *Lynch* v. *United States,* 292 U. S. 571, 580 (1934); *Bowen, supra,* at 52. Equally well established, however, is that the sovereign does not shed its sovereign powers just because it contracts. See *Providence Bank* v. *Billings,* 4 Pet. 514, 565 (1830). The Government's contracting authority has survived from the beginning of the Nation with no diminution in bidders, so far as I am aware, without the curtailment of the unmistakability doctrine announced today.

The difficulty caused by the principal opinion's departure from existing law is best shown by its own analysis of the contracts presently before us. The principal opinion tells us first that "[n]othing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry." *Ante,* at 868. But, it agrees with the finding of

the Federal Circuit, that "'the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected' in the agreements between the parties." *Ibid.*\* From this finding, the principal opinion goes on to say that "[w]e read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence." *Ante,* at 868–869. Then, in a footnote, the opinion concedes that "[t]o be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language." *Ante,* at 869, n. 15.

But if there is a "serious contest" about the correctness of their interpretive positions, surely the unmistakability doctrine—a canon of construction—has a role to play in resolving that contest. And the principal opinion's reading of additional terms into the contract so that the contract contains an unstated, additional promise to insure the promisee against loss arising from the promised condition's nonoccurrence seems the very essence of a promise implied in law, which is not even actionable under the Tucker Act, rather than a promise implied in fact, which is. See *Hercules, Inc.* v. *United States,* 516 U. S. 417, 423 (1996).

At any rate, the unmistakability doctrine never comes into play, according to the principal opinion, because we cannot know whether the damages which could be recovered in later proceedings would be akin to a rebate of a tax, and therefore the "equivalent of" an injunction. This approach tosses to the winds any idea of the unmistakability doctrine as a canon of construction; if a canon of construction cannot come into play until the contract has first been interpreted as to liabil-

---

\*Of course it must be remembered that the Federal Circuit had also said that the unmistakability doctrine does not apply where damages are being sought, an approach that even the principal opinion cannot expressly endorse.

ity by an appellate court, and remanded for computation of damages, it is no canon of construction at all.

The principal opinion's search for some unifying theme for somewhat similar cases from *Fletcher* v. *Peck,* 6 Cranch 87, in 1810, to the present day is an interesting intellectual exercise, but its practical fruit is inedible.

## II

The principal opinion also makes major changes in the existing sovereign acts doctrine which render the doctrine a shell. The opinion formally acknowledges the classic statement of the doctrine in *Horowitz* v. *United States,* 267 U. S. 458 (1925), quoting: " '[i]t has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction of the performance of the particular contract resulting from its public and general acts as a sovereign.' " *Ante,* at 892 (quoting 267 U. S., at 461). The principal opinion says that this statement cannot be taken at face value, however, because it reads "the essential point" of *Horowitz* to be "to put the Government in the same position that it would have enjoyed as a private contractor." *Ante,* at 892; see also *ante,* at 893 (*Horowitz* emphasized "the need to treat the Government-as-contractor the same as a private party"). But neither *Horowitz,* nor the Court of Claims cases upon which it relies, confine themselves to so narrow a rule. As the quotations from them in the principal opinion show, the early cases emphasized the *dual* roles of Government, as contractor and as sovereign. See, *e. g., Deming* v. *United States,* 1 Ct. Cl. 190, 191 (1865) ("The United States as a contractor are not responsible for the United States as a lawgiver"). By minimizing the role of lawgiver and expanding the role as private contractor, the principal opinion has thus casually, but improperly, reworked the sovereign acts doctrine.

The principal opinion further cuts into the sovereign acts doctrine by defining the "public and general" nature of an

act as depending on the government's motive for enacting it. The new test is to differentiate between "regulatory legislation that is relatively free of Government self-interest" and "statutes tainted by a governmental object of self-relief." *Ante,* at 896. We are then elevated to a higher jurisprudential level by reference to the general philosophical principles enunciated in *Hurtado* v. *California,* 110 U. S. 516, 535–536 (1884), that "[l]aw . . . must be not a special rule for a particular person or a particular case, but . . . 'the general law . . .' so 'that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society.'" Surely this marks a bold, if not brash, innovation in the heretofore somewhat mundane law of government contracts; that law is now to be seasoned by an opinion holding that the Due Process Clause of the Fourteenth Amendment did not make applicable to the States the requirement that a criminal proceeding be initiated by indictment of a grand jury.

The principal opinion does not tell us, nor do these lofty jurisprudential principles inform us, how we are to decide whether a particular statute is "free of governmental self-interest," on the one hand, or "tainted by" a government objective of "self-relief," on the other. In the normal sense of the word, any tax reform bill which tightens or closes tax loopholes is directed to "government self-relief," since it is designed to put more money into the public coffers. Be the act ever so general in its reform of the tax laws, it apparently would not be a "sovereign act" allowing the Government to defend against a claim by a taxpayer that he had received an interpretation from the Internal Revenue Service that a particular type of income could continue to be treated in accordance with existing statutes or regulations.

But we are told "self-relief" is not, as one might expect, necessarily determined by whether the Government benefited financially from the legislation. For example, in this case the principal opinion acknowledges that we do not know

"the dollar value of the relief the Government would obtain" if respondents had to comply with the modified capital-infusion requirements. *Ante,* at 900. Rather the opinion concludes that FIRREA, the law involved in this case, was "tainted by" self-relief based on "the attention" that Congressmen "[gave] to the regulatory contracts prior to passage" of the Act. *Ibid.*

Indeed, judging from the principal opinion's use of comments of individual legislators in connection with the enactment of FIRREA, it would appear that the sky is the limit so far as judicial inquiries into the question whether the statute was "free of governmental self-interest" or rather "tainted" by a Government objective of "self-relief." It is difficult to imagine a more unsettling doctrine to insert into the law of Government contracts. By fusing the roles of the Government as lawgiver and as contractor—exactly what *Horowitz* warned against doing—the principal opinion makes some sort of legislative intent critical in deciding these questions. When it enacted FIRREA was the Government interested in saving its own money, or was it interested in preserving the savings of those who had money invested in the failing thrifts?

I think it preferable, rather than either importing great natural-law principles or probing legislators' intent to modify the sovereign acts doctrine, to leave that law where it is. *Lynch* stands for the proposition that the congressional repeal of a statute authorizing the payment of money pursuant to a contractual agreement is a breach of that contract. But, as the term "public and general" implies, a more general regulatory enactment—whether it be the Legal Tender Acts involved in *Deming, supra,* or the embargo on shipments of silk by freight involved in *Horowitz*—cannot by its enforcement give rise to contractual liability on the part of the Government.

Judged by these standards, FIRREA was a general regulatory enactment. It is entitled "[a]n [a]ct to reform, recapi-

talize, and consolidate the Federal deposit insurance system, to enhance the regulatory and enforcement powers of federal financial institutions regulatory agencies, and for other purposes." 103 Stat. 183. As the principal opinion itself explains, "FIRREA made *enormous changes* in the structure of federal thrift regulation by (1) abolishing FSLIC and transferring its functions to other agencies; (2) creating a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation; (3) replacing the Bank Board with the Office of Thrift Supervision . . . ; and (4) establishing the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets." *Ante*, at 856 (emphasis added). The Act occupies 372 pages in the Statutes at Large, and under 12 substantive titles contains more than 150 numbered sections. Among those sections are the ones involved in the present case. Insofar as this comprehensive enactment regulated the use of goodwill, it did so without respect to how closely the savings association was regulated; its provisions dealt with the right of *any* thrift association, after the date of its enactment, to count intangible assets as capital. See 12 U. S. C. §§ 1464(t)(1)(A), (2), (3), (9). And by these provisions, the capital standards of thrifts were brought into line with those applicable to national banks. See § 1464(t)(1)(C). The principal opinion does not dispute that Congress, through this mammoth legislation, "acted to protect the public." *Ante*, at 903.

### III

JUSTICE SCALIA finds that the unmistakability doctrine does apply to the contracts before us. He explains that when the government is a contracting party, "it is reasonable to presume . . . that the sovereign does *not* promise that none of its multifarious sovereign acts . . . will incidentally disable it or the other party from performing," under the contract, *"unless the opposite clearly appears." Ante*, at 921. In other words, the sovereign's right to take subsequent action continues "unless th[e] right has been specifi-

cally surrendered in terms which admit of no other reason-. able interpretation." *St. Louis,* 210 U. S., at 280. JUSTICE SCALIA finds that the presumption has been rebutted here; he, like JUSTICE BREYER, finds that the Government had made a promise that its subsequent action would not frustrate the contract. JUSTICE SCALIA, however, finds that obligation is contained implicitly within the "promis[e] to regulate . . . in a particular fashion," and the Government's consideration. *Ante,* at 921.

But that is hardly what one normally thinks to be "unmistakable terms." Indeed, that promise plus consideration is no different from what JUSTICE SCALIA says applies to private parties. *Ante,* at 920. The Government has "promise[d] to do $x$ in exchange for [respondents] doing $y$," and in so doing "*impliedly* promise[d] not to do anything that [would] disable [the Government] from doing $x$, or disable [respondents] from doing $y$—so that if either of [the parties'] performances is rendered impossible by such an act on [the Government's] part, [the Government is] not excused from [its] obligation." *Ibid.* (emphasis added). But more than this is required for Government contracts, as JUSTICE SCALIA had seemed to acknowledge.

His point about *quid pro quo* adds little, for it necessarily assumes that there has been a promise to provide a particular regulatory treatment which cannot be affected by subsequent action, as opposed to a promise to provide that treatment unless and until there is subsequent action. *Ante,* at 921. But determining which promise the Government has made is precisely what the unmistakability doctrine is designed to determine. If the Government agreed to treat the losses acquired by respondents as supervisory goodwill in the short term, but made no commitment about their regulatory treatment over the long term, respondents still received consideration. Such consideration would be especially valuable to an unhealthy thrift because it would provide "a number of immediate benefits to the acquiring

thrift" that would stave off foreclosure. Brief for United States 27.

In addition, JUSTICE SCALIA does not himself make the findings necessary for respondents to prevail, but relies on the findings of the trial court and the Court of Appeals for the Federal Circuit with respect to what the Government actually promised. *Ante*, at 922. But both the trial court and the Court of Appeals held the unmistakability doctrine did *not* apply here. Therefore, even under JUSTICE SCALIA's own premises, these findings are insufficient because they were made under a mistaken view of the applicable law.

## IV

JUSTICE BREYER in his separate concurrence follows a different route to the result reached by the principal opinion. But even under his own view of the law, he omits a necessary step in the reasoning required to hold the Government liable. He says that "the lower courts held that each [respondent] proved the existence of an express promise by the Government to grant them particular regulatory treatment for a period of years." *Ante*, at 913. But the Government could have made that promise and *not* made the further promise to pay respondents in the event that the regulatory regime changed. JUSTICE BREYER concludes that second promise did exist as a matter of fact, but he never makes that finding himself. Instead, he says that the "principal opinion's careful examination of the circumstances reveals" that the Government did "inten[d] to make a binding promise . . . to hold the thrifts harmless from the effects of future regulation (or legislation)." *Ante*, at 918. But the principal opinion does not treat this as a question of fact at all, as JUSTICE BREYER does, but instead as something which occurs by operation of law.

JUSTICE BREYER relies on this illusory factual finding while at the same time commenting how implausible it would be for the Government to have intended to insure against a

change in the law. He notes that "it might seem unlikely" for the Government to make such a promise, *ibid.*, and further comments that because the contracting party is the Government, it may be "far less likely that [the parties] *intend[ed]* to make a promise that will oblige the Government to hold private parties harmless in the event of a change in the law," *ante*, at 913.

The short of the matter is that JUSTICE BREYER and JUSTICE SCALIA cannot reach their desired result, any more than the principal opinion can, without changing the status of the Government to just another private party under the law of contracts. But 75 years ago Justice Holmes, speaking for the Court in *Rock Island, A. & L. R. Co.* v. *United States,* 254 U. S. 141, 143 (1920), said that "[m]en must turn square corners when they deal with the Government." The statement was repeated in *Federal Crop Ins. Corp.* v. *Merrill,* 332 U. S. 380, 385 (1947). The wisdom of this principle arises, not from any ancient privileges of the sovereign, but from the necessity of protecting the federal fisc—and the taxpayers who foot the bills—from possible improvidence on the part of the countless Government officials who must be authorized to enter into contracts for the Government.

V

A moment's reflection suggests that the unmistakability doctrine and the sovereign acts doctrine are not entirely separate principles. To the extent that the unmistakability doctrine is faithfully applied, the cases will be rare in which close and debatable situations under the sovereign acts doctrine are presented. I do not believe that respondents met either of these tests, and I would reverse the judgment of the Court of Appeals for the Federal Circuit outright or remand the case to that court for reconsideration in light of these tests as I have enunciated them.